IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| AURINIA PHARMACEUTICALS INC., and AURINIA PHARMA U.S., INC., <br><br>         *Plaintiffs*, <br><br>   v. <br><br> GEORGE F. TIDMARSH, <br><br>         *Defendant*. | Civil Action No. 8:25-cv-3593 <br><br> **<u>Oral Hearing Requested</u>** |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
(1) PETITION TO CERTIFY SCOPE OF EMPLOYMENT AND SUBSTITUTE
UNITED STATES AS DEFENDANT PURSUANT TO 28 U.S.C. § 2679(d)(3), AND
<u>(2) MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 3

    A.    Dr. Tidmarsh's Background............................................................... 3

    B.    Dr. Tidmarsh Joins the FDA ............................................................ 4

    C.    Dr. Tidmarsh's LinkedIn Post......................................................... 6

    D.    This Action....................................................................................... 7

LEGAL STANDARDS ............................................................................................ 8

    I.    The Westfall Act and FTCA ................................................................... 8

    II.    Motion to Dismiss .................................................................................. 9

ARGUMENT .......................................................................................................... 9

    I.    The United States Must Be Substituted As Defendant Pursuant to
        28 U.S.C. § 2679(d)(3) ....................................................................... 9

        A.    Dr. Tidmarsh's LinkedIn Post Concerned the Core Mission of
            CDER and Was Squarely Within the Scope of his CDER
            Directorship Under Maryland Law ........................................... 11

        B.    Aurinia's Attempt to Ascribe an Illicit Motive to Dr. Tidmarsh's
            LinkedIn Post Is Unrelated to Whether the Statement Was Within
            the Scope of His Employment ................................................. 15

        C.    Aurinia's Contentions Do Not Establish That Dr. Tidmarsh's
            LinkedIn Post Was Outside the Scope of His CDER Directorship ........ 16

    II.    Aurinia's Complaint Must Be Dismissed for Failure to Adequately Plead
        Defamation and Injurious Falsehood ................................................... 20

        A.    Aurinia Fails to Adequately Plead That the Statements Were False ....... 20

        B.    Aurinia Fails to Plead Malice ................................................... 24

            i.    Plaintiffs Are Limited-Purpose Public Figures........................... 25

            ii.    Plaintiffs' Have Not Adequately Pleaded Actual Malice ........... 28

        C.    Aurinia Fails to Plead Special Damages ................................... 29

CONCLUSION....................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alessa v. Phelan*,
No. DLB-21-0924, 2025 WL 1019808 (D. Md. Apr. 3, 2025) ......................................2, 8, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................................9

*Balt. City Police Dep't v. Potts*,
468 Md. 265 (Md. 2020)......................................................................................................11, 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................................9

*Bello v. United States*,
93 F. App'x 288 (2d Cir. 2004) ...............................................................................................5, 8

*Blue Ridge Bank v. Veribanc, Inc.*,
866 F.2d 681 (4th Cir. 1989) ................................................................................................25, 27

*Bobulinski v. Goldman*,
No. 24-00974 (AHA), 2025 WL 1707696 (D.D.C. June 18, 2025) .......................................13

*Borneman v. United States*,
213 F.3d 819 (4th Cir. 2000) ...................................................................................................5, 8

*Brown v. Brockett*,
No. JFM–11–240, 2012 WL 1552783 (D. Md. Apr. 27, 2012)................................................17

*CACI Premier Tech., Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) ...................................................................................................29

*Cannon v. Peck*,
36 F.4th 547 (4th Cir. 2022) ...............................................................................................28, 29

*Cap. Meats, Inc. v. Meat Shoppe, LLC*,
No. JFM–15–212, 2015 WL 4249166 (D. Md. July 9, 2015) .................................................30

*Carey v. Throwe*,
957 F.3d 468 (4th Cir. 2020) .........................................................................................9, 23, 28

*Carr v. Forbes, Inc.*,
259 F.3d 273 (4th Cir. 2001) ...................................................................................................26

*Cartwright v. Pfizer, Inc.*,
    369 F. Supp. 2d 876 (E.D. Tex. 2005) ...................................................................12

*Cox v. Prince George's Cnty.*,
    296 Md. 162 (Md. 1983) ........................................................................................12

*Digital Dream Labs, Inc. v. Living Tech. (Shenzhen) Co.*,
    2:20-CV-01500-CCW, 2023 WL 121749 (W.D. Pa. Jan. 6, 2023) .......................17

*Display Works, LLC v. Pinnacle Exhibits, Inc.*,
    No. WMN-15-2284, 2015 WL 7454084 (D. Md. Nov. 24, 2015) ..........................29

*Doe v. Johns Hopkins Health Sys. Corp.*,
    274 F. Supp. 3d 355 (D. Md. 2017) ......................................................................19

*Does 1-10 v. Haaland*,
    973 F.3d 591 (6th Cir. 2020) .................................................................13, 16, 18

*E. Coast Freight Lines v. Mayor & City Council of Baltimore*,
    190 Md. 256 (Md. 1948) ........................................................................................11

*Fitzgerald v. Penthouse Int'l, Ltd.*,
    691 F.2d 666 (4th Cir. 1982) ...............................................................24, 25, 27

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ...............................................................................................12

*Futrell v. AVCO Corp.*,
    No. 5:04-CV-971-FL, 2006 WL 8438659 (E.D.N.C. Sept. 29, 2006) ....................8

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) ...............................................................................................28

*Gibbons v. Bank of Am. Corp.*,
    No. CIV. JFM-08-3511, 2012 WL 94569 (D. Md. Jan. 11, 2012) .........................29

*Gohari v. Darvish*,
    363 Md. 42 (Md. 2001) ..........................................................................................19

*Great Atl. & Pac. Tea Co. v. Noppenberger*,
    171 Md. 378 (Md. 1937) ........................................................................................11

*Gutierrez de Martinez v. Drug Enf't Admin.*,
    111 F.3d 1148 (4th Cir. 1997) ................................................................................8

*Harvey v. Cable News Network, Inc.*,
    48 F.4th 257 (4th Cir. 2022) .................................................................20, 21, 23

*Horning v. Hardy*,
    36 Md. App. 419 (Md. Ct. Spec. App. 1977) ........................................................20

*Larsen v. Chinwuba*,
    377 Md. 92 (Md. 2003) ...............................................................................13, 17

*Le Marc's Mgmt. Corp. v. Valentin*,
    349 Md. 645 (Md. 1998) ....................................................................................29

*Maron v. United States*,
    126 F.3d 317 (4th Cir. 1997) ........................................................................15, 17

*Doe v. Meron*,
    929 F.3d 153 (4th Cir. 2019) ...............................................................10, 11, 15

*Nanji v. Nat'l Geographic Soc'y*,
    403 F. Supp. 2d 425 (D. Md. 2005) ....................................................................20

*Nat'l Bd. for Certification in Occupational Therapy, Inc. v. Am. Occupational
    Therapy Ass'n*,
    24 F. Supp. 2d 494 (D. Md. 1998) ......................................................................20

*Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*,
    793 F. Supp. 627 (D. Md. 1992) ..............................................................24, 25, 27

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964).............................................................................................24

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*,
    20-CV-2875 (LDH) (PK), 2022 WL 900604 (E.D.N.Y. Mar. 28, 2022) ..............30

*Operation Rescue Nat'l v. United States*,
    147 F.3d 68 (1st Cir. 1998)............................................................................2, 18

*Operation Rescue Nat'l v. United States*,
    975 F. Supp. 92, 107 (D. Mass. 1997) ...............................................................18

*Osborn v. Haley*,
    549 U.S. 225 (2007).........................................................................................8, 9

*Reid v. GMC Skin Care USA Inc.*,
    8:15-CV-277 (BKS/CFH), 2016 WL 403497 (N.D.N.Y. Jan. 15, 2016) ..............12

*Reuber v. Food Chem. News, Inc.*,
    925 F.2d 703 (4th Cir. 1991) ........................................................................24, 26

*Sage Title Grp., LLC v. Roman*,
    455 Md. 188 (Md. 2017).....................................................................................11

*Sawyer v. Humphries*,
   322 Md. 247 (Md. 1991) ...............................................................................................10, 11, 12

*SCO Grp., Inc. v. Novell, Inc.*,
   No. 2:04–CV–139 TS, 2010 WL 413807 (D. Utah Jan. 28, 2010) ........................................30

*Shapiro v. Massengill*,
   105 Md. App. 743 (Md. Ct. Spec. App. 1995) .....................................................................24

*Smith v. Clinton*,
   253 F. Supp. 3d 222 (D.D.C. 2017), *aff'd*, 886 F.3d 122 (D.C. Cir. 2018)............................17

*Tall v. Bd. of Sch. Comm'rs of Baltimore City*,
   120 Md. App. 236 (Md. Ct. Spec. App. 1998) .....................................................................17

*Telnikoff v. Matusevitch*,
   347 Md. 561 (Md. 1997)......................................................................................................20

*Time, Inc. v. Pape*,
   401 U.S. 279 (1971).............................................................................................................29

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*,
   705 F. Supp. 3d 510 (D. Md. 2023)......................................................................................29

*United States v. Undetermined Quantities of Articles of Drug*,
   145 F. Supp. 2d 692 (D. Md. 2001)......................................................................................25

*Watkins v. Cable News Network, Inc.*,
   GJH-17-780, 2018 WL 1970747 (D. Md. Apr. 25, 2018)......................................................20

**Statutes**

28 U.S.C. § 2679(b)(1) ...............................................................................................................8, 9

28 U.S.C. § 2679(d)(3) ............................................................................................................ *passim*

28 U.S.C. § 2679(d)(1) ...............................................................................................................2, 8

Federal Tort Claims Act.............................................................................................................. *passim*

Westfall Act .............................................................................................................................. *passim*

**Other Authorities**

Federal Rule of Civil Procedure 9(g)...........................................................................................9, 20

Federal Rule of Civil Procedure 12(b)(6) ................................................................................ *passim*

Restatement of Agency § 228 cmt. b ............................................................................................11

Restatement of Agency § 229 .........................................................................................................11

Dr. George F. Tidmarsh respectfully submits this memorandum of law in support of (1) his petition to certify scope of employment and substitute the United States as defendant pursuant to 28 U.S.C. § 2679(d)(3), and (2) his alternative motion to dismiss the Complaint ("Compl.") brought by Aurinia Pharmaceuticals Inc. and Aurinia Pharma U.S. Inc. (together, "Aurinia" or "Plaintiffs") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs are well-resourced, highly sophisticated pharmaceutical companies that manufacture and sell voclosporin, an oral treatment for active lupus nephritis (a kidney complication of lupus) in adults. Aurinia, which boasts a market cap in excess of $2 billion, brings this defamation action against an individual, Dr. Tidmarsh, for statements and opinions he expressed as the Director of the Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research ("CDER"). Dr. Tidmarsh is a distinguished scientist, physician and academic who, while serving his country as Director of CDER, stated that CDER will be re-evaluating the use of surrogate endpoints—substitutes for direct measurement of clinical benefits—in drug testing to ensure the safety and effectiveness of drugs offered to the American public, and expressed concerns that voclosporin, which had been approved using surrogate endpoints, had not been shown to provide direct clinical benefits for patients.

Aurinia purports to invoke defamation law to punish Dr. Tidmarsh for daring to express views as Director of CDER that challenge Aurinia's flagship product, voclosporin, which is the cornerstone of Aurinia's commercial strategy. Apparently not satisfied in seeking to dispute the substance of Dr. Tidmarsh's remarks, Aurinia's Complaint dedicates 27 pages and more than 100 paragraphs to a myriad of inflammatory and irrelevant allegations that accuse Dr. Tidmarsh of all kinds of wrongdoing. None of these allegations has any bearing on the narrow claims before the Court and serve only to drag Dr. Tidmarsh's name and reputation through the mud (and the truth

1

is that Kevin Tang, Chairman of Aurinia's Board of Directors, all but explicitly asked Dr. Tidmarsh to abuse his position at the FDA to help one of Mr. Tang's companies).

As a threshold matter, however, Aurinia's claims fail for one very simple reason: Dr. Tidmarsh is not the correct defendant. This is the exact kind of case for which the Federal Tort Claims Act's ("FTCA") immunity was designed. The FTCA, as amended by the Westfall Act, provides that the United States shall be substituted as the party defendant for a federal employee who has been sued where the claim is based on acts within the employee's scope of employment. 28 U.S.C. § 2679(d)(1).

Dr. Tidmarsh, while employed as one of the highest-ranking officials in the FDA, made public comments about what the FDA and CDER should do to improve their drug evaluation and approval processes. This is plainly within the scope of his employment under applicable Maryland law because the statement was made in furtherance of his agency's objectives and were at least incidental to acts he was authorized to perform as Director of CDER, regardless of Aurinia's efforts to ascribe a personal motive to his comments. Indeed, courts have found government employees entitled to Westfall Act substitution in circumstances where their statements were far more attenuated and disassociated from the official mission of the relevant agency. *See, e.g.*, *Alessa v. Phelan*, 2025 WL 1019808, at *9-10, *13 (D. Md. Apr. 3, 2025) (DHS Supervisor's and Navy Captain's allegedly defamatory statements about former coworker's infidelity and mental stability were "Navy business" and within the scope of employment); *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 69 (1st Cir. 1998) (Senator's statements accusing nonprofit abortion organization of domestic terrorism were within the scope of his employment).

Here, Dr. Tidmarsh's statements—about CDER's plans to review the sufficiency of drug testing and approvals and concerns about prior procedures—were precisely in furtherance of the

2

FDA's stated mission to ensure that marketed drugs are safe and effective. Accordingly, this is not a close case: Dr. Tidmarsh is entitled to immunity from this suit like any other federal employee who is accused of state-law torts within the scope of their employment.

Even if the United States is not substituted as defendant, the Complaint must be dismissed for failure to state a claim. Aurinia does not plausibly plead the essential elements of either defamation or injurious falsehood. As to falsity, Dr. Tidmarsh's post is substantially correct when read in context: it accurately characterized voclosporin's prior approval as resting on surrogate endpoints, *i.e.*, substitute markers that predict or correlate with clinical benefit but are not measurements of *direct* clinical benefits—which is confirmed in the very sources to which Aurinia cites. As to fault, Plaintiffs are limited-purpose public figures in the public controversy over the safety and efficacy of their FDA-regulated drug and fail to plead actual malice, particularly where the cited materials confirm Dr. Tidmarsh's views or at least admit of multiple reasonable interpretations, one of which was adopted by Dr. Tidmarsh. Finally, the injurious falsehood claim independently fails for lack of special damages, which must be pleaded with particularity. Aurinia identifies neither specific lost customers nor facts showing a material and substantial diversion of business. Indeed, while Aurinia alleges that its stock price was affected by Dr. Tidmarsh's comments, it rebounded almost immediately and was, and is still, trading higher than pre-statement levels before Aurinia filed this Complaint.

For these reasons, the Court should substitute the United States for Dr. Tidmarsh under 28 U.S.C. § 2679(d)(3) or dismiss the Complaint with prejudice under Rule 12(b)(6).

## BACKGROUND

### A. Dr. Tidmarsh's Background

Dr. Tidmarsh holds an M.D. and a Ph. D in cancer biology from Stanford University, was a founding co-director of Stanford's Master of Science in Translational Research and Applied

3

Medicine Program, and has over 30 years of experience in biotechnology, clinical medicine, and regulatory science.  Over the course of Dr. Tidmarsh's extensive career, he has authored well over 100 publications and patents, led the clinical development of multiple FDA-approved drugs, and served as the leader of multiple biopharmaceutical companies, including those he ran with Mr. Tang.  Dr. Tidmarsh's career has been defined by a lifelong passion and commitment to developing effective and safe drug treatments for patients.

Dr. Tidmarsh worked for numerous companies associated with Mr. Tang beginning in at least January 2012.  Compl. ¶¶ 29-30.  Mr. Tang trusted Dr. Tidmarsh's expertise and leadership, appointing him as President and CEO at La Jolla Pharmaceutical Company ("La Jolla") and director of La Jolla, Odonate Therapeutics, and American Laboratories.  *Id.* ¶¶ 30-31. Dr. Tidmarsh's expertise and leadership were so highly valued at American Laboratories that the company granted Dr. Tidmarsh significant profit interests in two components that entitled Dr. Tidmarsh to regular sizeable payments.  *Id.* ¶ 33.  In November 2019, Dr. Tidmarsh and Mr. Tang ceased working together.  *Id.* ¶¶ 34-36.

In connection with his passion for pharmaceuticals and mission to promote safe drug treatments, Dr. Tidmarsh would frequently track drug approvals and testing and comment on them on social media.  *See, e.g.*, *id.* ¶ 49.

**B.  Dr. Tidmarsh Joins the FDA**

On July 21, 2025, Dr. Tidmarsh agreed to join the FDA as Director of CDER.  *Id.* ¶ 53.  At CDER, Dr. Tidmarsh was responsible for the branch of the FDA that oversees reviewing, approving, and regulating most prescription and over-the-counter drugs, as well as removing and restricting the marketing of approved drugs.  *Id.*  Dr. Tidmarsh was the sole Director of CDER and the highest-ranking official in CDER.  Dr. Tidmarsh reported to the Office of the Commissioner of the FDA.

4

Shortly before Dr. Tidmarsh was set to join the FDA, Mr. Tang renewed their relationship and expressed interest in talking to Dr. Tidmarsh and meeting in person. Compl. Ex. 2 at 5-6. Mr. Tang also gave his consent for Dr. Tidmarsh to transfer his interest in American Laboratories to Virello Group, LLC—an LLC in which Dr. Tidmarsh had no financial interest that was managed by Dr. Tidmarsh's attorney, Joseph Galda. Compl. ¶ 54; Declaration of Joseph P Galda ("Galda Decl.") ¶¶ 4-5, 8.[1] On August 3, 2025, Mr. Tang reached out to Dr. Tidmarsh regarding an FDA issue with an American Laboratories drug that used "DTE API." Compl. Ex. 2 at 7. Mr. Tang explained his company's extensive meetings with the FDA prior to Dr. Tidmarsh's appointment as Director of CDER. *Id*. Mr. Tang said he "wanted to make sure [Dr. Tidmarsh] was aware of the situation." *Id*. Dr. Tidmarsh did not respond. *Id*. Days later, an entirely separate division of the FDA, without any connection to Dr. Tidmarsh and over which Dr. Tidmarsh had no control or authority, announced it was taking actions to remove DTE from the market. Compl. ¶ 56.

Three weeks after news about the FDA's action on DTE, Mr. Galda reached out by email to Mr. Tang on behalf of Virello Group to request an extension of the American Laboratories agreements. *Id*. ¶ 61. Mr. Galda reached out because given the uncertainty surrounding DTE, Mr. Galda was concerned that the payments under the agreement would dry up and Virello Group would not get the amounts it had expected. Galda Decl. ¶¶ 11-12. Accordingly, Mr. Galda was hoping for a gratuitous extension by American Laboratories but had no real expectations of success. *Id.* ¶ 12. Following the email, Mr. Tang and Mr. Galda spoke on the phone during which Mr. Tang was desperate and wanted to talk to Dr. Tidmarsh to see if Dr. Tidmarsh could help Mr. Tang in any way. *Id*. ¶¶ 16-18. Mr. Galda understood this to mean help from Dr. Tidmarsh

---

[1] The Declaration of Joseph Galda is submitted in support of Dr. Tidmarsh's Petition to Certify Scope of Employment and Substitute the United States as Defendant. The Court is permitted to consider evidence outside the Complaint when deciding such a Petition. *See Borneman v. United States*, 213 F.3d 819, 827-28 (4th Cir. 2000); *Bello v. United States*, 93 F. App'x 288, 290 (2d Cir. 2004).

in his position as Director of CDER.  *Id.* ¶ 18.  Mr. Galda told Mr. Tang that Dr. Tidmarsh would

not be able to help Mr. Tang and was not offering help in exchange for the contract extension.  *Id.*

### C.  Dr. Tidmarsh's LinkedIn Post

On the morning of Monday, September 29, 2025, Dr. Tidmarsh, as Director of CDER,

made a post on LinkedIn about plans that CDER had for evaluating and updating their testing and

approval processes.  Compl. ¶ 70.  The post centered around Dr. Tidmarsh's vision for CDER,

which was in line with his life passion to improve drug testing and approvals.  The post stated:



Compl. Ex. 14.

This post referred to voclosporin, the drug manufactured and sold by Aurinia.  Compl. ¶ 71.

Voclosporin was approved based on studies on surrogate endpoints which the FDA describes as

predicting or correlating to a clinical benefit but are not themselves "a measure of clinical benefit."

*Id.* ¶ 75; Declaration of Darrell S. Cafasso ("Cafasso Decl.") Ex. A at 7.  Voclosporin was not

tested on hard clinical endpoints such as end-stage renal disease.  Compl. ¶ 75.

At the time Dr. Tidmarsh made the LinkedIn post, he was serving as Director of CDER and commenting directly about improving the FDA's and CDER's testing and approval of prescription drugs.  *Id.* ¶ 70.  Indeed, in the post, Dr. Tidmarsh's position as Director of CDER is listed prominently below his name and he specifically refers to CDER and its intent to improve drug testing and approvals in the future.  *Id.* Ex. 14.

Following Dr. Tidmarsh's post, a number of media articles were written by both pharmaceutical commentators and business commentators.  *Id.* ¶ 72.  Wanting to avoid the media attention on himself and CDER, Dr. Tidmarsh took down the post and deflected attention away from the FDA.  *Id.* ¶ 90.  On November 3, 2025, due to the controversy resulting from this lawsuit and other well-publicized dissension within the FDA, Dr. Tidmarsh resigned from the FDA.[2]

**D.  This Action**

On November 2, 2025, Aurinia filed this Complaint against Dr. Tidmarsh, alleging state law tort claims for defamation and injurious falsehood.  Dkt. 1.  Aurinia alleges that Dr. Tidmarsh's LinkedIn post was false, defamatory, made with actual knowledge of falsity or reckless regard as to falsity, and that it harmed Aurinia's reputation and business.  Dkt. 1.

On November 14, 2025, Dr. Tidmarsh sent a copy of this Complaint and summons to the FDA's Office of the General Counsel with a letter requesting that the FDA begin the process to certify that Dr. Tidmarsh was acting within the scope of his employment.  Cafasso Decl. ¶ 8.  On December 3 and 4, 2025, attorneys from the Torts Branch, Civil Division, Department of Justice ("DOJ") reached out to Dr. Tidmarsh to confirm that the process was underway and would take

---

[2] Dr. Tidmarsh's successor as CDER Director, Dr. Richard Pazdur, lasted just one month on the job, in light of the continuing turmoil within the FDA wholly unrelated to Aurinia's baseless attacks against Dr. Tidmarsh.  *See* Santhosh, Christy, "US FDA's newly appointed drugs chief set to retire," Reuters (Dec. 3, 2025), https://www.reuters.com/business/healthcare-pharmaceuticals/newly-appointed-drug-evaluation-chief-set-leave-fda-stat-news-reports-2025-12-02/.  Should this case proceed against Dr. Tidmarsh, he looks forward to setting the story straight about the circumstances surrounding his departure from the FDA and Mr. Tang's role in it.

time to complete.  *Id.* ¶ 9.  As of the date of this filing, the DOJ is continuing to assess Dr. Tidmarsh's request for certification that he was acting within the scope of employment.  *Id.* ¶ 10.

## LEGAL STANDARDS

### I.    The Westfall Act and FTCA

The Westfall Act amended the FTCA to provide absolute immunity for federal employees in suits alleging state-law claims for actions taken "while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1).  Where such claims are brought against a federal employee, the employee is entitled to have the Attorney General certify that the employee was acting within the scope of their employment and have the United States substituted as the defendant in the action. 28 U.S.C. § 2679(d)(1).  Alternatively, the employee may move the court to certify that the employee was acting within the scope of their employment and substitute the United States as defendant.  28 U.S.C. § 2679(d)(3).  Ultimately, the court must decide the question of scope of employment and substitution.  *See Osborn v. Haley*, 549 U.S. 225, 245-46 (2007).

When the employee moves the court for certification and substitution, the burden is on the movant to "show by a preponderance of the evidence" that certification and substitution is appropriate.  *Futrell v. AVCO Corp.*, 2006 WL 8438659, at *13 (E.D.N.C. Sept. 29, 2006) (citing *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1153 (4th Cir. 1997)).  The Court must review the question *de novo*.  *Id*.  When considering certification and substitution, the Court must "weigh the sufficiency of the evidence, to determine whether genuine issues of fact exist, and ultimately to resolve these factual issues."  *Borneman*, 213 F.3d at 827.  The court is permitted to consider facts outside of the complaint to resolve these issues.  *See id.* at 827-28; *Bello*, 93 F. App'x at 290.  "A court reviewing Westfall Act certification is not required to accept a plaintiff's allegations as true."  *Alessa*, 2025 WL 1019808, at *13 (citing *Osborn*, 549 U.S. at 231).

## II.  <u>Motion to Dismiss</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court need not accept "legal conclusions" or "unwarranted inferences, unreasonable conclusions or arguments."  *Carey v. Throwe*, 957 F.3d 468, 474 (4th Cir. 2020) (citation omitted).  Special damages must be pleaded with particularity under Fed. R. Civ. P. 9(g).

## <u>ARGUMENT</u>

## I.  <u>The United States Must Be Substituted As Defendant Pursuant to 28 U.S.C. § 2679(d)(3)</u>

The FTCA provides the exclusive remedy for claims based on the allegedly "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office."  28 U.S.C. § 2679(b)(1).  In any "civil action or other proceeding for money damages" that arises out of such conduct, the claims must be brought against the United States, not the government employee.  *Id*.  Because both of Aurinia's claims allege "wrongful act[s] or omission[s]" by Dr. Tidmarsh in his role as Director of CDER, Dr. Tidmarsh is immune from suit and is entitled to have the United States substituted as the defendant in this action.

The purpose of the FTCA and the Westfall Act is to "immunize covered federal employees not simply from liability, but from suit."  *Osborn*, 549 U.S. at 238.  If an individual federal employee is named as a defendant in a lawsuit, the FTCA provides that the defendant may petition the court to "certify that the employee was acting within the scope of his office or employment." 28 U.S.C. § 2679(d)(3).  Indeed, as the Supreme Court has explained, "a complaint's charge of conduct outside the scope of employment, when contested, warrants immediate judicial investigation.  Were it otherwise, a federal employee would be stripped of suit immunity not by

what the court finds, but by what the complaint alleges." *Osborn*, 549 U.S. at 247. Whether the alleged conduct falls within the scope of a government employee's office is determined by the law of the state where the conduct occurred—here, Maryland. *Doe v. Meron*, 929 F.3d 153, 164 (4th Cir. 2019).

While Aurinia attempts to smear Dr. Tidmarsh with misleading, incomplete, and out-of-context text messages and emails that have nothing to do with this lawsuit, the allegations underlying Aurinia's two causes of action are limited to a single LinkedIn post that Dr. Tidmarsh made on September 29, 2025, as Director of CDER. Compl. ¶¶ 103-28. Thus, the Court's evaluation of whether Dr. Tidmarsh was acting within the scope of his duties as Director of CDER should be limited solely to Dr. Tidmarsh's LinkedIn post, as reproduced on page 6 *supra*.

The LinkedIn post at issue here falls squarely within the scope of Dr. Tidmarsh's employment as Director of CDER in that it specifically states what CDER intends to do in the future:

- "CDER will be evaluating surrogate endpoints used for FDA approval";

- "we [CDER] have approved drugs with significant toxicity like vocolosporin [*sic*] that has not been shown to provide a direct clinical benefit for patients"; and

- "[w]e [CDER] will be taking a close look at the use of surrogate endpoints…."

Compl. ¶ 70.

As set forth more fully below, Dr. Tidmarsh's LinkedIn post updating the public on CDER's plan for evaluating surrogate endpoints in drug testing was plainly within the scope of his duties as Director of CDER. Accordingly, the United States must be substituted as defendant pursuant to the FTCA and the Westfall Act and Dr. Tidmarsh should be dismissed from this action.

### A. Dr. Tidmarsh's LinkedIn Post Concerned the Core Mission of CDER and Was Squarely Within the Scope of his CDER Directorship Under Maryland Law

Maryland law provides a broad, two-part scope-of-employment test: whether the acts were in furtherance of the employer's business and were "authorized" by the employer. *Sawyer v. Humphries*, 322 Md. 247, 256 (Md. 1991). The Maryland Supreme Court has stated that "[i]n applying this test, there are few, if any, absolutes." *Id.* Some of the "pertinent" considerations under either prong of *Sawyer* are (1) whether "the conduct [is] of the kind the servant is employed to perform," (2) whether the conduct "occur[s] during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area," and (3) whether the conduct was "actuated at least in part by a purpose to serve the master." *Id.* (quoting *E. Coast Freight Lines v. Mayor & City Council of Baltimore*, 190 Md. 256, 285 (Md. 1948) (citing Restatement of Agency § 228 cmt. b)). Although not required, Dr. Tidmarsh's post satisfies all three of these criteria.

Under the first *Sawyer* prong, to be "in furtherance of the [employer's] business," the Maryland Supreme Court has considered whether an employee's conduct was "at least partially motivated by a purpose to serve [the employer]." *See Balt. City Police Dep't v. Potts*, 468 Md. 265, 306 (Md. 2020) (citing *Sawyer*, 322 Md. at 255-57); *Meron*, 929 F.3d at 166 ("Under District of Columbia (and Maryland) law, employees' conduct need only be motivated *at least in part* by a purpose to serve their employer to be within the scope of their employment." (emphasis added)).

Under the second *Sawyer* factor, even where the employee's conduct was "not intended or consciously authorized by the" employer, that conduct "may be within the scope of [] employment" if it is "'of the same general nature as that authorized, or incidental to the conduct authorized.'" *See Sawyer*, 322 Md. at 256 (quoting *Great Atl. & Pac. Tea Co. v. Noppenberger*, 171 Md. 378, 390-391 (Md. 1937) (quoting Restatement of Agency § 229)); *Sage Title Grp., LLC*

11

*v. Roman*, 455 Md. 188, 212-13 (Md. 2017) ("That an act is 'consciously criminal or tortious' does not preclude it from falling within the scope of employment. . . . The analysis considers, instead, 'whether the act was such as ***was incident to the performance of the duties entrusted to him by the master, even though in opposition to his express and positive orders***.'") (emphasis added) (citation omitted)).  To be clear, "authorized" does not mean "authority expressly conferred" but, rather, "whether the act was such as was incident to the performance of the duties entrusted to [the employee] by the [employer], even though in opposition to his express and positive orders." *Sawyer*, 322 Md. at 255 (citation omitted).  Courts also consider "whether the employee's conduct was 'expectable' or 'foreseeable.'"  *Id.* at 256 (quoting *Cox v. Prince George's Cnty.*, 296 Md. 162, 171 (Md. 1983)).

Aurinia's claims are based entirely on Dr. Tidmarsh's September 29, 2025, LinkedIn post (*see* Compl. ¶¶ 103-28), which was within the scope of his duties as Director of CDER.  According to its website, CDER's primary purpose is to "mak[e] sure that safe and effective drugs are available to improve the health of people in the United States."[3]  *See also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 374–75 (2024) ("Under federal law, the [FDA], an agency within the Executive Branch, ensures that drugs on the market are safe and effective."); *Reid v. GMC Skin Care USA Inc.*, 2016 WL 403497, at *9 (N.D.N.Y. Jan. 15, 2016) ("The FDCA charges the [FDA] with protecting public health by ensuring, inter alia, that drugs are safe and effective, and that cosmetics are safe and properly labeled.") (citation omitted); *Cartwright v. Pfizer, Inc.*, 369 F. Supp. 2d 876, 886 (E.D. Tex. 2005) ("Clearly, the FDA, through its regulations, recognizes its important dual purpose—to provide scientifically accurate information and to protect consumers.").

---

[3] https://www.fda.gov/about-fda/fda-organization/center-drug-evaluation-and-research-cder.

Dr. Tidmarsh's LinkedIn post was commenting on CDER's drug approval process and potential improvements to CDER's clinical trial testing protocols to accelerate the approval of safe drugs in the United States—issues that quite clearly go to the heart of the FDA's and CDER's mandate to ensure safe and effective drugs. *See Larsen v. Chinwuba*, 377 Md. 92, 107, 109 (Md. 2003) (Maryland Insurance Commissioner was entitled to statutory immunity for allegedly defamatory statements as to Plaintiff HMO's purported insolvency where those statements "were incident to the performance of his duties" as Insurance Commissioner). Notably, in *Larsen* the Maryland Supreme Court stated expressly that "the head of a major agency in the executive branch of government is authorized to disclose to the public matters concerning the agency's operations." *Id.* at 107. That is precisely what Dr. Tidmarsh did as CDER Director.

Indeed, courts have held that where, as here, a public official comments in social media posts about "newsworthy matters" or "proceedings before the legislative body in which [the defendant] serve[d]," that act was within the scope of his employment. *Bobulinski v. Goldman*, 2025 WL 1707696, at *2, *4 (D.D.C. June 18, 2025) (Congressman was immune from suit under the Westfall Act for social media posts in which the Congressman accused plaintiff of perjury because the posts concerned "newsworthy matters, and proceedings before the legislative body in which he serves, as part of his duties as a member of Congress," explaining that "today, such engagement with the public often occurs on social media."); *see also Does 1-10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020) (Westfall Act applied to social media statements by Members of Congress accusing teenagers of intolerance and hate because "social media websites are the 'modern public square'" and "public communications between an elected official and their constituents" are within the scope of employment) (internal citations omitted).

Upon his July 21, 2025 appointment as Director of CDER, the FDA's press release stated that "as Director of the Center for Drug Evaluation and Research (CDER) … Dr. Tidmarsh will lead the FDA's efforts to ensure safe, effective, and high-quality drugs are available to the American people."[4]  In direct furtherance of his mandate, Dr. Tidmarsh informed the public in his post as to his concerns with CDER's past drug approval process and his intent to improve that process to accelerate the approval of safe, effective drugs in the future.  In fact, Dr. Tidmarsh specifically referenced CDER, stating that: (i) "CDER will be evaluating surrogate endpoints used for FDA approval," (ii) "[CDER has] approved drugs with significant toxicity," and (iii) "[CDER] will be taking a close look at the use of surrogate endpoints to see where [CDER] can further accelerate promising drugs faster while requiring companies to perform the trials necessary to confirm actual clinical benefit."  Compl. ¶ 70.  In other words, Dr. Tidmarsh was publicly commenting on CDER's go-forward plans for evaluating the use of surrogate endpoints in drug testing, "to see where [CDER] can further accelerate promising drugs faster while requiring companies to perform the trials necessary to confirm actual clinical benefit"—that is directly in furtherance of CDER's mission to ensure that "safe and effective drugs are available to improve the health of people in the United States."  *See supra* at 12.

Accordingly, under Maryland law, Dr. Tidmarsh's post was within the scope of his duties as Director of CDER because it was motivated "at least in part" by a purpose to serve CDER, it was, at a minimum, "incident to the performance of his duties," and the post was reasonably "expected" and "foreseeable" for someone serving as Director of CDER.  Indeed, the allegedly offending post was the scientific opinion of a renowned physician and high-ranking FDA official about the testing and approval of drugs, how CDER could improve its processes, and concerns

---

[4] https://www.fda.gov/news-events/press-announcements/stanford-faculty-member-george-tidmarsh-md-phd-named-director-center-drug-evaluation-and-research.

14

about the use of surrogate endpoints for drugs like voclosporin, which is obviously within the scope of his employment at CDER. Thus, because under well-settled Maryland law the only act giving rise to Aurinia's claims was within the scope of Dr. Tidmarsh's duties as Director of CDER, the United States must be substituted as defendant under the FTCA and the Westfall Act.

### B. Aurinia's Attempt to Ascribe an Illicit Motive to Dr. Tidmarsh's LinkedIn Post Is Unrelated to Whether the Statement Was Within the Scope of His Employment

Although Aurinia's Complaint spends 27 pages and more than 100 paragraphs concocting a self-serving and transparently false narrative painting Dr. Tidmarsh as waging a years-long personal vendetta against Mr. Tang and his companies, this does not undermine a finding of scope of employment. Under Maryland law, the motive behind Dr. Tidmarsh's LinkedIn post (or any other action) is not relevant for purposes of determining whether he was acting within the scope of his employment when he posted that message.

Courts in this Circuit have held time and again that where, as here, a plaintiff alleges that a personal motivation was behind a defendant's alleged tortious conduct, the plaintiff must establish that the defendant was **_solely motivated_** by the alleged personal desire and that absent that showing, that allegation is not determinative to the analysis of whether a defendant was acting within the scope of his employment. *See Maron v. United States*, 126 F.3d 317, 325 (4th Cir. 1997) ("Further, even if we should apply somewhat heightened scrutiny to intentional torts, we find that Maron is simply wrong to suggest that if he can prove that personal motivation may have played a role in the tort, however slight, he must automatically prevail."); *Meron*, 929 F.3d at 166 (refusing to overturn government's scope of employment certification based on conclusory allegations as to personal motive of defendant and explaining that "[t]o demonstrate that the individual defendants were acting outside the scope of their employment, [plaintiff] must be able to show that all the defendants were ***solely*** motivated by a personal desire" (emphasis added)).

Here, given his role as CDER Director and the express content of his LinkedIn post, Aurinia cannot make the required showing that Dr. Tidmarsh was **<u>solely motivated</u>** by a personal desire in making the statement.  As previously noted, Dr. Tidmarsh specifically referenced CDER in the LinkedIn post, expressed concern with CDER's past drug approval process, and stated that CDER intended to evaluate the use of surrogate endpoints when approving drugs in the future—a decision that would impact drugs approved using surrogate endpoints like voclosporin, but many others too.  *Supra* at 6.  Dr. Tidmarsh's focus on approving safe and effective drugs in the United States is not only the core mission of CDER, but concerned—according to the press release issued by CDER upon Dr. Tidmarsh's appointment as Director—the very purpose for which Dr. Tidmarsh was named CDER Director.  *Supra* at 12, 14.  With this in mind, under no circumstances can Aurinia demonstrate that Dr. Tidmarsh acted solely for a personal desire when he made the complained-of statement such that his LinkedIn post could be deemed outside the scope of his CDER Directorship.

### C.  Aurinia's Contentions Do Not Establish That Dr. Tidmarsh's LinkedIn Post Was Outside the Scope of His CDER Directorship

Aurinia's Complaint largely ignores the actual content of Dr. Tidmarsh's LinkedIn post and instead raises extraneous issues that Aurinia contends somehow alter the legal analysis such that Dr. Tidmarsh's LinkedIn post would fall outside the scope of his CDER Directorship.  Specifically, Aurinia alleges that the LinkedIn post is outside the scope of Dr. Tidmarsh's employment because: (i) it was posted to Dr. Tidmarsh's personal LinkedIn account (Compl. ¶ 88); (ii) on information and belief, Dr. Tidmarsh lacked authority from the FDA and/or CDER to make the statements in the LinkedIn post (*id.*); (iii) on information and belief, the post violated the FDA's policies and procedures (*id.* ¶ 89); and (iv) Dr. Tidmarsh allegedly retracted the post. (*id.* ¶ 90.) Each of these assertions is groundless under settled Maryland law.

*First*, whether Dr. Tidmarsh used his personal or official social media accounts to publicly comment on the efficacy, safety and approval of drugs is irrelevant for purposes of determining whether he was acting within the scope of his employment with CDER. *Haaland*, 973 F.3d at 601 ("[I]t is the act of communicating one's views to constituents and not the manner of communication that justifies application of the Westfall Act."); *see also Larsen*, 377 Md. at 107 ("Certainly, as a general matter, the head of a major agency in the executive branch of government is authorized to disclose to the public matters concerning the agency's operations."); *Smith v. Clinton*, 253 F. Supp. 3d 222, 237 (D.D.C. 2017), *aff'd*, 886 F.3d 122 (D.C. Cir. 2018) (holding that the use of a personal email server was irrelevant to whether Secretary Clinton's acts were within the scope of employment). Further, Dr. Tidmarsh's LinkedIn post expressly stated that he was Director of CDER, further confirming that his post was made within the scope of his employment. *See Digital Dream Labs, Inc. v. Living Tech. (Shenzhen) Co.*, 2023 WL 121749, at *3 (W.D. Pa. Jan. 6, 2023) (applying Pennsylvania's similar scope-of-employment law, and finding that the defendant holding "himself out on social media" as director of his employer was evidence that posts were within the scope of his employment).

*Second*, whether Dr. Tidmarsh had express authority to post about CDER or whether the post allegedly violated the FDA's policies and procedures is not dispositive for determining scope of employment. Maryland law consistently holds that even acts that are expressly prohibited or forbidden, acts that are intentionally tortious, and acts that are in violation of the employers' policies and procedures, can still be considered within the employee's scope of employment. *See Tall v. Bd. of Sch. Comm'rs of Baltimore City*, 120 Md. App. 236, 252 (Md. Ct. Spec. App. 1998) ("Accordingly, an act may be within the scope of the employment, even though forbidden or done in a forbidden manner, or consciously criminal or tortious." (citation omitted)); *Brown v. Brockett*,

2012 WL 1552783, at *5 (D. Md. Apr. 27, 2012) ("[Employee's] failure to follow [employer's] policy does not, alone, make her actions outside the scope of employment."); *Maron*, 126 F.3d at 325 ("Few government authorities are authorized to commit torts as part of their line of duty, but to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity defense." (citation omitted)).    The salient question is whether the activity was incidental to the employee's performance of his duties, not whether the activity was expressly authorized.  *See Potts*, 468 Md. at 275, 305 (police officers' "egregious" conduct of "planting handguns, beating [plaintiff], making false statements in police reports, and testifying falsely at trial" violated "express … orders" but were still incidental to the performance of their duties as police officers and therefore were within the scope of employment).

Applying this test, Dr. Tidmarsh's remarks were at least incidental to his duties as Director of CDER.  Indeed, as noted above, courts have granted certification of scope-of-employment for torts by federal employees that are far more attenuated from official job duties than Dr. Tidmarsh's post.  For example:

- In *Alessa*, 2025 WL 1019808, at *9-10, Judge Boardman of this District held that a Department of Homeland Security ("DHS") supervisor and a Navy Captain were acting within the scope of their employment because their statements involved "Navy business" and were "at least incidental" to their employment, where the DHS supervisor allegedly falsely accused a Navy employee of making improper travel requests in violation of federal law and improperly staying at her DHS's supervisor's house while traveling for work, and the Navy Captain allegedly falsely stated that plaintiff was mentally unstable, overstated her abilities and credentials in securing government employment, and was a poor performer who had her security clearance revoked.

- In *Haaland*, 973 F.3d at 601-02, the Sixth Circuit held that a Congresswoman and a Senator acted within the scope of their government employment because "the allegedly defamatory

statements were made in the context of informing constituents of the Congressmembers' views and as part of their advocacy" as to immigration policy where they posted false statements to their official and campaign Twitter accounts accusing students of harassing and mocking a Native American with hateful taunts.

- In *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 107 (D. Mass. 1997) the District Court denied plaintiff's challenge to a United States Attorney's decision to grant a Westfall Act certification that a United States Senator acted within the scope of his employment because the Senator "was informing his constituents and the general public of his view on pending [abortion] legislation scheduled to be considered by the Senate" where, in a response to media questions at a campaign event, the Senator allegedly falsely accused the an anti-abortion group of having a national policy of "firebombing" and even "murder." The First Circuit affirmed. *Operation Rescue Nat'l*, 147 F.3d at 69.

If such statements were found to be within the scope of federal employment, there can be no question that Dr. Tidmarsh's comments also meet the standard. Dr. Tidmarsh, as Director of CDER, notified the public that "CDER will be evaluating surrogate endpoints used for FDA approval" and "will be taking a close look at the use of surrogate endpoints to see where [CDER] can further accelerate promising drugs faster while requiring companies to perform the trials necessary to confirm actual clinical benefit." This was directly related to CDER's core mission of ensuring safe and effective drugs are made available to patients. Perhaps if Dr. Tidmarsh was commenting, for example, that he believed an airplane manufacturer's airplanes were dangerous and unsafe, something that would not have been related to his duties as Director of CDER, then it could be argued that he was acting outside the scope of his employment. But even if he had made such a statement, it would still be a close call, under the authorities above, as to whether that was within the scope of his employment. But given that his post concerned the exact mission of CDER, the law is crystal clear that Dr. Tidmarsh's post was at least incidental to his duties as Director of CDER.

## II.    Aurinia's Complaint Must Be Dismissed for Failure to Adequately Plead Defamation and Injurious Falsehood

"Under Maryland law, to establish a *prima facie* case of defamation, a plaintiff must establish that (1) the defendant made a defamatory statement to a third person (a requirement known as publication); (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm." *Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355, 365 (D. Md. 2017) (citing *Gohari v. Darvish*, 363 Md. 42 (Md. 2001)). Aurinia has failed to adequately plead the second and third elements of defamation. Aurinia's own sources demonstrate that Dr. Tidmarsh's statement was not false and, because Plaintiffs are limited-purpose public figures who must establish actual malice, they have failed to plead that Dr. Tidmarsh knew or should have known the statements were false.

A claim for injurious falsehood is similar to defamation, requiring Aurinia to establish that Dr. Tidmarsh, "with malice, published a known falsity to a third party, that caused special damages." *Nat'l Bd. for Certification in Occupational Therapy, Inc. v. Am. Occupational Therapy Ass'n*, 24 F. Supp. 2d 494, 511 (D. Md. 1998) (citing *Horning v. Hardy*, 36 Md. App. 419 (Md. Ct. Spec. App. 1977)). Like the claim for defamation, Aurinia has failed to plead both falsity and malice. Aurinia also failed to plead special damages with particularity as required under Fed. R. Civ. P. 9(g). Accordingly, both claims must be dismissed pursuant to Rule 12(b)(6).

### A. Aurinia Fails to Adequately Plead That the Statements Were False

In a defamation suit, "truth is no longer an affirmative defense to be established by the defendant, but instead the burden of proving falsity rests upon the plaintiff." *Telnikoff v. Matusevitch*, 347 Md. 561, 594 (Md. 1997) (citation omitted); *Watkins v. Cable News Network, Inc.*, 2018 WL 1970747, at *5 (D. Md. Apr. 25, 2018) (dismissing because "Plaintiff has not plausibly pleaded that Defendants made a defamatory statement that was not 'substantially

correct'"). A statement is "false" if it is "not substantially correct." *Nanji v. Nat'l Geographic Soc'y*, 403 F. Supp. 2d 425, 431 (D. Md. 2005) (citation omitted). "Minor inaccuracies do not amount to falsity so long as the substance or gist is justified." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 270 (4th Cir. 2022) (citation omitted). When determining whether a statement is substantially correct, the Court must consider the statement in its entirety. *Nanji*, 403 F. Supp. 2d at 431.

Aurinia focuses on two statements in Dr. Tidmarsh's post that they allege are false: "And for some diseases such as lupus nephritis, companies have not run trials to demonstrate a benefit on hard clinical endpoints like progression to end stage renal disease. So we have approved drugs with significant toxicity like voclosporin that has not been shown to provide a direct clinical benefit for patients." Compl. Ex. 14. These statements appear in Dr. Tidmarsh's social media post wherein he expresses interest in reexamining the FDA's process to authorize drugs based on testing on surrogate endpoints, rather than actual clinical benefit. Aurinia alleges that these statements falsely claim that voclosporin has not shown a clinical benefit and that Aurinia has not performed the trials necessary to confirm actual clinical benefit. Compl. ¶¶ 109-10. But Aurinia removes the statements from their obvious context and tries to twist Dr. Tidmarsh's words as stating that voclosporin does not work or should not be used by patients. *See, e.g.*, *id.* ¶¶ 84-86. That is not what he said.

In support of their allegations of falsity, Aurinia points to a number of public documents regarding voclosporin's testing and approval by the FDA and international drug regulators. *Id.* ¶¶ 75-80. But, the materials cited and incorporated into the Complaint by Aurinia either directly support the veracity of Dr. Tidmarsh's statement or are unrelated to what Dr. Tidmarsh actually said in his social media post. Looking past Aurinia's cherry-picking of quotes and attempts to

obfuscate what Dr. Tidmarsh actually said, it is evident that Dr. Tidmarsh was entirely correct, and at worst, Aurinia takes issue with his choice of words, not the substance of the message. Neither scenario is sufficient to establish falsity. *See Harvey*, 48 F.4th at 270 ("Minor inaccuracies do not amount to falsity so long as the substance or gist is justified.").

The crux of Aurinia's argument is that voclosporin was approved based on trials that "demonstrated an improvement on a validated surrogate endpoint" which are endpoints that *predict* a clinical benefit. Compl. ¶ 75. But, as recognized by Aurinia's sources, a surrogate endpoint, even a validated one, can only "predict [a] clinical benefit" and "is not itself a measure of clinical benefit." Cafasso Decl. Ex. A at 7; *see also* 21 USCA § 357(e)(9) ("The term 'surrogate endpoint' means a marker, such as a laboratory measurement, radiographic image, physical sign, or other measure, that is not itself a direct measurement of clinical benefit."). In the FDA guidance cited by Aurinia, the FDA makes it clear that surrogate endpoints only "predict clinical benefit," rather than prove it, and, like Dr. Tidmarsh, the FDA distinguishes surrogate endpoints from clinical endpoints, which are "characteristic[s] or variable[s] that directly measure[] a therapeutic effect of a drug in humans" such as "how a patient feels … functions … or survives." Cafasso Decl. Ex. A at 6-7. As demonstrated by Aurinia's sources, the FDA consistently distinguishes surrogate endpoints from clinical endpoints—where a patient's symptoms actually improve—and reemphasizes that surrogate endpoints predict, rather than demonstrate, clinical benefit. Cafasso Decl. Ex. B at 1. This critical distinction is consistent with Dr. Tidmarsh's statement in that he was writing about FDA approvals based on surrogate endpoints, which only predict clinical benefits, rather than clinical endpoints that measure metrics like survivability. *See* Compl. Ex. 14.

Further, consistent with Dr. Tidmarsh's comments, the studies cited by Aurinia confirm that voclosporin was tested on surrogate endpoints, not clinical endpoints. Aurinia points to the

FDA's Multi-disciplinary Review and Evaluation which discusses a clinically meaningful benefit from voclosporin. Compl. ¶ 76. However, this review again confirms that the "clinical benefit" was based on testing of the surrogate endpoints Complete Renal Response and a reduction in protein in the urine, which are only "correlated" and "associated" with actual clinical endpoints and direct clinical benefits. Cafasso Decl. Ex. C at 18-21. Moreover, the document acknowledges that these surrogate endpoints do not prove the clinical benefits Dr. Tidmarsh was referring to because science has yet to "definitively validate endpoints to … reduction in progression to [End-Stage Renal Disease] and death" and these endpoints can only "predict" the impact on clinical benefits. *Id*. at 21. The FDA's approval of voclosporin's supplemental new drug application in 2024 used the same Complete Renal Response surrogate endpoint as the basis for approving the application. Cafasso Decl. Ex. D at 21. Similarly, the European Medicines Agency report cited by Aurinia identifies improvement in the same surrogate endpoint of kidney function. Compl. ¶ 77; Cafasso Decl. Ex. E at 2. Again, based on Aurinia's sources, this surrogate endpoint does not "provide" direct clinical benefits, which is what Dr. Tidmarsh stated in his post.

Dr. Tidmarsh's post does not claim that voclosporin failed to show benefit to surrogate endpoints or that it is ineffective in treating renal failure. Reading Dr. Tidmarsh's post in context, it echoes exactly what Aurinia's studies show: voclosporin has not been tested on direct clinical endpoints and, although it may predict or correlate to a clinical benefit, it has not shown to provide a direct clinical benefit. The studies reference a "clinically meaningful benefit," but it is clear from the full context of Dr. Tidmarsh's post—which starts saying that "CDER will be evaluating surrogate endpoints used for FDA approvals"—that the "direct clinical benefit" he is referring to is the improvement in clinical endpoints, something the studies demonstrate voclosporin has not shown. Indeed, Aurinia admits that there was no testing on direct clinical endpoints because it

was "not required."  Compl. ¶ 75.  This admission gets to the heart of Dr. Tidmarsh's post, which is to question whether such testing should be required in addition to testing on surrogate endpoints. While Aurinia tries to quibble about language such as "shown direct clinical benefit," their own evidence demonstrates that Dr. Tidmarsh's statement was at least substantially correct.  *See Harvey*, 48 F.4th at 270 ("Minor inaccuracies do not amount to falsity so long as the substance or gist is justified."); *Carey*, 957 F.3d at 474 (the Court need not accept Plaintiffs' "unwarranted inferences" and "unreasonable conclusions").

Moreover, Aurinia confuses the difference between a "clinically meaningful benefit," as referenced by the FDA, and a "direct clinical benefit," as referred to in Dr. Tidmarsh's post.  In his post, when referencing a "direct clinical benefit" Dr. Tidmarsh is plainly referring to clinical endpoints testing—*i.e.*, testing showing a measurable, positive effect on how a patient actually feels, functions, or survives—a protocol that was indisputably never used for voclosporin.  As previously discussed, the FDA is clear that a "direct clinical benefit" is distinct from using surrogate endpoints to *predict* a "clinically meaningful benefit"—which Aurinia admits is the only testing that occurred for voclosporin here.  *See* Cafasso Decl. Ex. A at 6-7.

Finally, Aurinia's evidence that the drug is recommended by doctors and used by patients is beside the point.  Compl. ¶¶ 79-80.  A plain reading of Dr. Tidmarsh's post demonstrates that he did not make any statements about whether voclosporin should be used by patients or recommended by physicians.  Evidence that the drug is recommended does not establish falsity of Dr. Tidmarsh's statements about voclosporin's testing results.  Consequently, Aurinia's defamation and injurious falsehood claims must be dismissed for failure to plead falsity.

### B.  Aurinia Fails to Plead Malice

Even if Aurinia adequately established falsity, it cannot overcome the extraordinary standard of "actual malice."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Reuber*

*v. Food Chem. News, Inc.*, 925 F.2d 703, 708 (4th Cir. 1991) ("To recover compensatory damages for defamation, a public official or public figure must show actual malice, while a private figure may recover under a lower standard of culpability.").  When a party casts itself into the forefront of a public issue, it becomes a limited-purpose public figure and must establish actual malice. *Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 668 (4th Cir. 1982).  Actual malice requires Plaintiffs to plead that the defendant published the statement "with reckless disregard for its truth or with actual knowledge of its falsity."  *Shapiro v. Massengill*, 105 Md. App. 743, 772 (Md. Ct. Spec. App. 1995); *Nat'l Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627, 648 (D. Md. 1992).

### i.    Plaintiffs Are Limited-Purpose Public Figures

Plaintiffs are limited-purpose public figures under the Fourth Circuit's two-step test, which considers: "whether the defamatory speech involves a matter of legitimate public concern and whether [plaintiff] is a public or private figure."  *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 686 (4th Cir. 1989).  Under the second step, the Fourth Circuit has articulated five additional factors to consider, which look at whether:

> 1) The Plaintiff has access to channels of effective communications; 2) the Plaintiff voluntarily assumed a role of special prominence in a public controversy; 3) the Plaintiff sought to influence the resolution or outcome of the controversy; 4) the controversy existed prior to the publication of the defamatory statements; and 5) the Plaintiff retained public figure status at the time of the alleged defamation.

*Nat'l Life Ins. Co.*, 793 F. Supp. at 635 (citing *Fitzgerald*, 691 F.2d at 668).  Plaintiffs meet all of these elements.

Under the first step, the issue of whether voclosporin's testing process and results are sufficient for the FDA, and therefore the public, is clearly a matter of public concern.  There is no dispute that the adequacy of testing for drugs approved by the FDA and used by consumers is a matter of public concern.  *See United States v. Undetermined Quantities of Articles of Drug*, 145

F. Supp. 2d 692, 704 (D. Md. 2001) ("There is an inherent danger to the public in the dissemination of drugs with no support as to their safety or efficacy.").  Aurinia acknowledges the public importance of the discussion around voclosporin in the Complaint, noting the importance of treatment for lupus nephritis and of protecting the public.  *See* Compl. ¶¶ 84, 86.  Further, courts have found a legitimate public controversy for matters regulated by the federal government, like the drug in this case.  *See Nat'l Life Ins. Co.*, 793 F. Supp. at 634 (holding that the financial health of the national insurance industry was a public controversy); *Blue Ridge Bank*, 866 F.2d at 686 ("Because of the obvious importance of banks to the financial health of our communities and the historic governmental interest in the operations and solvency of these institutions, we have no difficulty concluding that [defendant's] statements relate to a matter of public concern.").  The "obvious importance" of the drug industry and testing and approval of those drugs is similarly clear here.  The first step is met.

As for the second step, the first factor is met because Aurinia has access to "effective communication."  The articles that Aurinia cites report that Aurinia quickly released a press release following Dr. Tidmarsh's post to "stand behind Lupkynis' risk and benefit profile."  Cafasso Decl. Ex. F at 2.  Aurinia enjoys enough of an access to effective communication such that not only are multiple articles written about their drug, their own press releases are reported by the media.  This satisfies the first factor.

Under the second and third factors, Aurinia "voluntarily assumed a role of special prominence in [] public controversy" and sought to influence that controversy.  *See Carr v. Forbes, Inc.*, 259 F.3d 273, 279-80 (4th Cir. 2001) ("'[P]ublic controversy' is a legal term of art; the term only encompasses a dispute 'that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.'").  Here, Aurinia voluntarily entered the public

controversy and sought to influence it through submitting voclosporin for FDA approval and subsequently marketing voclosporin across the world.  Aurinia explains that they own the only FDA-approved voclosporin product, the product is an important treatment that is currently marketed and approved in 37 countries, and remains a "mainstay treatment."  Compl. ¶¶ 67, 69, 80.  This voluntary unique status positions Aurinia prominently in the public controversy surrounding voclosporin's testing, treatment, and results.  Such broadcasting of Aurinia's positions towards its drugs is sufficient to constitute voluntary efforts.  *See Reuber*, 925 F.2d at 710 (plaintiff voluntarily entered controversy by writing a report and disseminating his views to interested parties); *Fitzgerald*, 691 F.2d at 669 (by seeking pecuniary gain and distributing information, plaintiff obtained special prominence and sought to influence the outcome of the controversy).

Regarding the fourth and fifth factors, the public controversy existed prior to the alleged defamatory statements and Aurinia has retained their public figure status.  As the owners of the only FDA-approved voclosporin drug, the public controversy surrounding Aurinia's testing and approval process began when the drug was approved.  Since the initial approval, Aurinia has continued to contribute to the controversy by submitting updated labels to the FDA and continuing to obtain approvals across the world.  Compl. ¶¶ 77-80.  That voclosporin was recommended by the American College of Rheumatology in 2024 further demonstrates that the "public controversy" about voclosporin's testing and results continued after FDA approval and predated the defamatory statements.  *Id.* ¶ 79.  As Aurinia remains the only authorized manufacturer and seller of voclosporin, Aurinia has remained a public figure at the time of the statement.

All of these factors demonstrate that Aurinia voluntarily "injected" themselves into prominent public issues such that the public may question them without fear of retribution.  *See Blue Ridge Bank*, 866 F.2d at 688.

### ii.    Plaintiffs' Have Not Adequately Pleaded Actual Malice

Aurinia also fails to plead that Dr. Tidmarsh's statements were published with actual knowledge of their falsity or a "high degree of awareness of . . . probable falsity." *Nat'l Life Ins. Co.*, 793 F. Supp. at 648 (citation omitted).  Aurinia's only bases for their allegations of actual malice are Dr. Tidmarsh's position as Director of CDER and the public sources cited in support of falsity, which, as noted, actually support Dr. Tidmarsh's statements.  In any event, Aurinia has not pleaded any facts to indicate how or why Dr. Tidmarsh, other than by virtue of his employment, had actual knowledge of Plaintiffs' sources and consciously knew his statements were false.  To the contrary, voclosporin was approved years before Dr. Tidmarsh was appointed to the FDA.  Given the sheer volume of drugs that Dr. Tidmarsh was responsible for regulating and the short amount of time that he held his position, Aurinia has not pleaded any plausible facts to suggest Dr. Tidmarsh knew that his statements about this one drug in particular were false.  At best, Aurinia is trying, and failing, to plead that Dr. Tidmarsh failed to properly investigate before making his statement, which the Supreme Court held cannot establish reckless disregard for the truth.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974).

And even assuming Aurinia established that Dr. Tidmarsh had actual knowledge of the sources they cite, and those sources could plausibly support the element of falsity, the sources' ambiguity and susceptibility to reasonable differences in interpretation prevent them from supporting Aurinia's claim of actual malice.  *See Cannon v. Peck*, 36 F.4th 547, 571 n.14 (4th Cir. 2022) ("Where a source is susceptible to at least two rational interpretations, a speaker or publisher may adopt one of a number of possible rational interpretations of [such sources] that [contain] ambiguities." (citation omitted).).  Aurinia's sources all explain that voclosporin was tested on surrogate endpoints and that surrogate endpoints predict or correlate to clinical benefits.  *See supra* Section II.A.  Dr. Tidmarsh's interpretation, as a well-educated, experienced, and respected

scientist, is, at a minimum, reasonable based on the sources. Aurinia's sources are clear that surrogate endpoints are distinct from clinical endpoints and do not "provide" direct clinical benefits the way that clinical endpoints do. *See supra* Section II.A. This aligns exactly with what Dr. Tidmarsh stated in his post. At the very least, any possible debate as to whether a surrogate endpoint's predictions or correlations to clinical benefits can be said to have "shown to provide" direct clinical benefits is subject to multiple reasonable interpretations, which is fatal to Aurinia's claim of malice. *Cannon*, 36 F.4th at 571 n.14; *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008) (citing *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971)).[5]

### C.  Aurinia Fails to Plead Special Damages

Injurious falsehood carries a "greater burden of proof" than defamation and requires special damages in all cases. *Gibbons v. Bank of Am. Corp.*, 2012 WL 94569, at *10 (D. Md. Jan. 11, 2012). Aurinia must plead with particularity that the statements "played a material and substantial part in inducing others not to deal with [them], and that as a result [they] had suffered special damage." *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 527 (D. Md. 2023) (citation omitted). These special damages must be specific and particular, "including either the loss of particular customers by name or a general diminution of business." *Display Works, LLC v. Pinnacle Exhibits, Inc.*, 2015 WL 7454084, at *4 (D. Md. Nov. 24, 2015) (citation omitted).

Here, Aurinia fail to plead with particularity that the statements played a material and substantial part in inducing others not to deal with them. The only allegations in the Complaint in support of special damages are that "numerous physicians … have raised concerns about

---

[5] The failure to allege "actual malice" also defeats Aurinia's claim for punitive damages, regardless of its status as a public figure. *See Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 651 (Md. 1998) ("[I]n any defamation action, regardless of a party's status or the subject matter, punitive damages are allowable only if the plaintiff proves that the defamatory statement was made with knowledge of its falsity or with reckless disregard for the truth.") (collecting cases).

voclosporin" and that Aurinia's stock price temporarily dropped.  Compl. ¶¶ 83-85.  Neither of these allegations satisfy the requirement for particularized pleading.  *See Total Recon Auto Ctr.*, 705 F. Supp. 3d at 527 (evidence that plaintiff received a negative customer review without evidence that the customer actually took their business elsewhere is insufficient to plead special damages).  Aurinia does not identify any physicians or patients who stopped using voclosporin as a result of the post, only physicians that raised "concerns."  Further, Aurinia's temporary stock price reduction (even if that can be said to be an injury to the company) does not demonstrate an overall diminution of the business, because the stock rebounded almost immediately and was, and still is, trading higher than pre-statement levels when Aurinia initiated this lawsuit.  *SCO Grp., Inc. v. Novell, Inc.*, 2010 WL 413807, at *6 (D. Utah Jan. 28, 2010) ("decline in stock price is not an appropriate claim for special damages"); *NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604, at *11 (E.D.N.Y. Mar. 28, 2022) ("Plaintiff's allegations that its stock price declined do not constitute special damages."); *cf. Cap. Meats, Inc. v. Meat Shoppe, LLC*, 2015 WL 4249166, at *11 (D. Md. July 9, 2015) (although plaintiff did not identify specific lost customers, allegations of a 70% reduction in revenue was sufficient for special damages.).  Accordingly, the injurious falsehood claim must be dismissed for failure to plead special damages with particularity.

## **CONCLUSION**

For the foregoing reasons, the Court should certify that Dr. Tidmarsh was acting within the scope of his employment and substitute the United States as Defendant pursuant to 28 U.S.C. § 2679(d)(3), or, in the alternative, dismiss the Complaint with prejudice under Rule 12(b)(6), and award such other and further relief as the Court deems just and proper.

Dated:  December 16, 2025

Respectfully submitted,

By:/s/ Darrell S. Cafasso
Darrell S. Cafasso (admitted *Pro Hac Vice*)
Gregory D. Beaman (admitted *Pro Hac Vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone:    (212) 506-5000
Fax:             (212) 212-5151
dcafasso@orrick.com
gbeaman@orrick.com

By:/s/ Sarah B. Meehan
(signed by Darrell S. Cafasso with permission
of Sarah B. Meehan)
Sarah B. Meehan (Bar. No. 30428)
ORRICK, HERRINGTON & SUTCLIFFE LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone:    (202) 339-8400
Fax:             (202) 339-8500
smeehan@orrick.com

*Attorneys for Defendant*
*Dr. George F. Tidmarsh*

31