# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

AURINIA PHARMACEUTICALS INC., and
AURINIA PHARMA U.S., INC.,

                                        *Plaintiffs*,

   v.

GEORGE F. TIDMARSH,

                                        *Defendant*.

Civil Action No. 8:25-cv-3593

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF PETITION TO CERTIFY SCOPE OF EMPLOYMENT AND SUBSTITUTE THE UNITED STATES AS DEFENDANT PURSUANT TO 28 U.S.C § 2679(d)(3) AND MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 1

ARGUMENT .................................................................................................................. 7

I.    The Westfall Act Does Not Insulate Tidmarsh from Liability for His Tortious Conduct. . 7

    A.    Tidmarsh's defamatory statements were made in his personal capacity, not in the scope of his employment as CDER Director. .......................................................... 8

    B.    At a minimum, this Court should allow Plaintiffs to take limited discovery on the scope-of-employment issue. ................................................................................... 17

II.    The Court Should Deny Tidmarsh's Motion to Dismiss. ................................................. 17

    A.    Tidmarsh's statements about Plaintiffs' voclosporin product were objectively false. ....................................................................................................................... 18

    B.    Tidmarsh does not establish that Plaintiffs are public figures because he identifies no "public controversy" involving Plaintiffs or voclosporin that predates his defamatory post. ..................................................................................................... 22

    C.    Plaintiffs more than sufficiently allege that Tidmarsh acted with actual malice. . 25

    D.    Tidmarsh's special damages argument does not warrant dismissal of the injurious falsehood claim. ................................................................................................... 28

CONCLUSION ............................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Alessa v. Phelan*,
    2025 WL 1019808 (D. Md. Apr. 3, 2025) .................................................................. 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................................................... 26

*Austin v. Torrington*,
    810 F.2d 416 (4th Cir. 1987) .................................................................................... 28

*BAA, PLC v. Acacia Mut. Life Ins. Co.*,
    400 Md. 136 (2007) ................................................................................................... 29

*Balt. City Police Dep't v. Potts*,
    227 A.3d 186 (Md. 2020) .......................................................................................... 12

*Batson v. Shiflett*,
    602 A.2d 1191 (Md. Ct. App. 1992).......................................................................... 20

*Blue Ridge Bank v. Veribanc, Inc.*,
    866 F.2d 681 (4th Cir. 1989) ............................................................................... 24, 25

*Bobulinski v. Goldman*,
    2025 WL 1707696 (D.D.C. June 18, 2025)............................................................... 13

*Brown v. Brockett*,
    2012 WL 1552783 (D. Md. Apr. 27, 2012)............................................................... 15

*Cannon v. Peck*,
    36 F.4th 547 (4th Cir. 2022) ............................................................................... 20, 21

*Cheek v. J. B. G. Props., Inc.*,
    28 Md. App. 29 (1975) .............................................................................................. 29

*Chinwuba v. Larsen*,
    790 A.2d 83, 116 (Md. Ct. Spec. App. 2002)........................................................... 12

*Daniel v. Home Box Office*,
    2023 WL 8478867 (D.Md. Dec. 7, 2023).................................................................. 20

*De Martinez v. Lamagno*,
    515 U.S. 417 (1995)..................................................................................................... 8

*Denny v. Seaboard Lacquer, Inc.*,
    487 F.2d 485 (4th Cir. 1973) .................................................................................... 26

*Does 1-10 v. Haaland,*
   973 F.3d 591 (6th Cir. 2020) ........................................................... 16

*Ennis v. Crenca,*
   587 A.2d 485 (Md. 1991) ........................................................... 11, 13

*Eramo v. Rolling Stone, LLC,*
   209 F. Supp. 3d 862 (W.D.Va. 2016) ........................................... 26, 27, 28

*Foretich v. Capital Cities/ABC, Inc.,*
   37 F.3d 1541 (4th Cir. 1994) ........................................................... 23

*Gaprindashvili v. Netflix, Inc.,*
   2022 WL 363537 (C.D. Cal. Jan. 27, 2022) ........................................... 21

*Garnett v. Remedi Seniorcare of Va., LLC,*
   892 F.3d 140 (4th Cir. 2018) ........................................................... 11

*Goldstein v. Hindle,*
   2024 WL 473736 (D. Md. Feb. 7, 2024) ........................................... 22, 28

*Gutierrez de Martinez v. Drug Enforcement Admin.,*
   111 F.3d 1148 (4th Cir. 1997) ........................................................... 17

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
   491 U.S. 657 (1989) ................................................................... 27, 28

*Hatfill v. N.Y. Times Co.,*
   416 F.3d 320 (4th Cir. 2005) ........................................................... 22

*Hebb v. City of Asheville,*
   145 F.4th 421 (4th Cir. 2025) ........................................................... 27

*Herbert v. Lando,*
   441 U.S. 153 (1979) ................................................................... 27

*Home Sav. Bank v. City of Des Moines,*
   205 U.S. 503 (1907) ................................................................... 29

*Hutchinson v. Proxmire,*
   443 U.S. 111 (1979) ............................................................. 23, 24, 25

*Intel Corp. Inv. Pol'y Comm. v. Sulyma,*
   589 U.S. 178 (2020) ................................................................... 21

*Jamison v. Wiley,*
   14 F.3d 222 (4th Cir. 1994) ........................................................... 8, 11

iv

*Jones v. Aberdeen Proving Ground Fed. Credit Union*,
　2022 WL 1017094 (D. Md. Apr. 5, 2022) ........................................................................... 26

*Kische USA, LLC v. Simsek*,
　2016 WL 6273261 (W.D. Wash. June 29, 2016) ................................................................. 29

*Larsen v. Chinwuba*,
　832 A.2d 193 (Md. 2003) ............................................................................................. 12, 13

*Maron v. U.S.*,
　126 F.3d 317 (4th Cir. 1997) ............................................................................................... 12

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
　674 F.3d 369 (4th Cir. 2012) ............................................................................................... 26

*MiMedx Grp., Inc. v. DBW Partners LLC*,
　2018 WL 4681005 (D.D.C. Sept. 28, 2018) ...................................................................... 29

*Neuberger v. U.S.*,
　2005 WL 1242058 (D. Md. May 25, 2005) ........................................................................ 17

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*,
　2022 WL 900604 (E.D.N.Y. Mar. 28, 2022) ..................................................................... 30

*Phillips v. Washington Mag., Inc.*,
　58 Md. App. 30 (1984) ........................................................................................................ 20

*Recovery Grp., Inc. v. C.I.R.*,
　652 F.3d 122 (1st Cir. 2011) ............................................................................................... 29

*Rite Aid Corp. v. Lake Shore Invs.*,
　298 Md. 611 (1984) ............................................................................................................. 30

*Ross v. Bryan*,
　309 F.3d 830 (4th Cir. 2002) ................................................................................................. 8

*Sawyer v. Humphries*,
　587 A.2d 467 (Md. 1991) ..................................................................................... 9, 10, 13, 16

*Scholes v. Am. Kennel Club, Inc.*,
　1999 WL 799532 (S.D.N.Y. Oct. 7, 1999) ........................................................................ 29

*SCO Grp., Inc. v. Novell, Inc.*,
　2010 WL 413807 (D. Utah Jan. 28, 2010) .......................................................................... 30

*Smith v. Clinton*,
　253 F. Supp. 3d 222 (D.D.C. 2017) .............................................................................. 15, 16

*Sotolongo v. Baltimore Bus. Publ'cns, Inc.*,
    1988 WL 137768 (D. Md. Oct. 25, 1988) ............................................................ 20

*Sterling Sav. Ass'n v. Ryan*,
    751 F. Supp. 871 (E.D. Wash. 1990) .................................................................. 29

*Stokes v. Cross*,
    327 F.3d 1210 (D.C. Cir. 2003) ......................................................................... 17

*Strabak v. Strabak*,
    108 Md. App. 633 (1996) ................................................................................... 29

*Tah v. Global Publ'g, Inc.*,
    413 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................... 21

*Tall v. Bd. of Sch. Comm'rs of Balt. City*,
    706 A.2d 659 (Md. Ct. Spec. App. 1998) ........................................................... 15

*Tomblin v. WCHS-TV8*,
    434 Fed. App'x 205 (4th Cir. 2011) ................................................................... 18

*Torres Advanced Enterprise Sols. LLC v. Mid-Atlantic Professionals Inc.*,
    2013 WL 531215 (D. Md. Feb. 8, 2013) ............................................................. 29

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*,
    705 F. Supp. 3d 510 (D. Md. 2023) .................................................................... 28

*Waldbaum v. Fairchild Publ'ns*,
    627 F.2d 1287 (D.C. Cir. 1980) ......................................................................... 24

*Wells v. Liddy*,
    186 F.3d 505, 540 (4th Cir. 1999) ...................................................................... 24

**Statutes**

28 U.S.C. § 2679(d)(3) ........................................................................................ 7,8

**Other Authorities**

1 R. Smolla, Law of Defamation § 4:2.50 (2d ed.) ................................................ 21

Meiring De Villiers, *Quantitative Proof of Reputational Harm*, 15 Fordham J. Corp. & Fin. L.
    (2010) ................................................................................................................. 29

## <u>INTRODUCTION</u>

This defamation action is about holding Defendant, Dr. George Tidmarsh, accountable for putting his desire for vengeance above the health and safety of vulnerable patient populations.

Tidmarsh has long nursed a personal grudge against Kevin Tang, who serves as Chair of the Board of Plaintiff Aurinia Pharmaceuticals Inc. (Aurinia) and manages Tang Capital Partners, LP (Tang Capital), an investment fund that is Aurinia's largest shareholder. The grudge dates to 2019, when Tang had Tidmarsh removed from positions he held with various pharmaceutical companies Tang was also affiliated with. For years, that grudge mostly manifested itself in vulgar and threatening texts and emails. But in 2025, Tidmarsh found himself in a position to make good on his threats when he was appointed Director of the Food and Drug Administration's (FDA's) Center for Drug Evaluation and Research (CDER). Within weeks of his appointment, he abused his office by first having FDA effectively remove from the market a product essential to one of Tang's companies, and then (unsuccessfully) soliciting a bribe from Tang in order to have that decision reversed. When Tang refused to deliver the demanded payoff, Tidmarsh next targeted voclosporin, the first FDA-approved oral therapy for the treatment of adult patients with active lupus nephritis, which Aurinia owns and distributes in the U.S. through Plaintiff Aurinia Pharma U.S., Inc. (Aurinia US).

On September 29, 2025, Tidmarsh published a post on his personal LinkedIn account that made multiple false claims including, most egregiously, that Aurinia's sole commercial drug product, voclosporin, has no "clinical benefit" to patients. That is not remotely true, as confirmed by FDA when it granted full approval for voclosporin. Tidmarsh knew it, but he published that falsehood anyways, because he wanted to cause harm to another Tang-affiliated company—which the LinkedIn post did.

Tidmarsh's Petition to Certify Scope of Employment and Substitute the U.S. as Defendant

Pursuant to 28 U.S.C. § 2679(d)(3) and Motion to Dismiss the Complaint [Dkt. 35] tries multiple unpersuasive tacks to avoid accountability for his egregious conduct.

First, he argues that the Court should certify that he published the offending LinkedIn post in the scope of his employment with FDA, so that he is immunized from liability under the Westfall Act. This request fails at the outset because it is premature—the U.S. Attorney by law must have a chance to weigh in on that question before the Court can decide it. But fundamentally, the notion that Tidmarsh published the post in furtherance of official FDA business is belied by the facts. The evidence shows that Tidmarsh published the post to further his personal vendetta against Tang; industry observers at the time noted how unusual it was for an FDA official to publish such a post; and in fact, Tidmarsh was put on leave by FDA after publishing it (he subsequently resigned).

Above all that though is the simple fact that Tidmarsh admitted publicly, in no uncertain terms, that he published the post in his personal capacity only and not to further any official FDA business. Specifically, hours after the first LinkedIn post, Tidmarsh publicly announced on LinkedIn:

> "***The views in my last post were my own personal views. They do not reflect the views of FDA or HHS. All official guidance or comments from the Agency or Department are made through official channels.*** For the avoidance of confusion I have deleted the post."[1]

Next, Tidmarsh argues that Plaintiffs fail to state claims for defamation and injurious falsehood, but none of his arguments for dismissal have merit. He attempts to argue that his first LinkedIn post is not false, but his claims that voclosporin "has not been shown to provide a direct clinical benefit for patients" and that Aurinia failed "to perform the trials necessary to confirm actual clinical benefit" from voclosporin are objectively false and at odds with the dispositive fact that the drug received full, not accelerated, FDA approval—requiring no confirmatory testing—

---

[1] Emphasis added throughout unless otherwise specified.

precisely because FDA concluded that extensive testing had already shown that voclosporin does provide a clinical benefit to patients. He next asserts that Plaintiffs are public figures required to plead that he acted with actual malice, but he fails to show that Plaintiffs and voclosporin were the subject of any "public controversy" predating his defamatory statements, and the Complaint amply pleads actual malice regardless. Finally, he argues that special damages are lacking for the injurious falsehood claim, but his arguments rely on a cramped interpretation of the law on what constitutes special damages.

For all of the reasons set forth herein, the Court should deny Tidmarsh's request to hold that he is protected by the Westfall Act and deny Tidmarsh's motion to dismiss.

## **BACKGROUND**

Aurinia is a biopharmaceutical company focused on delivering therapies to people living with autoimmune disease. In January 2021, Aurinia introduced voclosporin (marketed under the brand name LUPKYNIS®), the first FDA-approved oral therapy for the treatment of adult patients with active lupus nephritis. (Compl. ¶ 20.) Voclosporin is distributed in the U.S. by Aurinia US, an Aurinia subsidiary. (*Id.* ¶¶ 21-22.)

Tidmarsh was the Director of FDA's CDER from July to October 2025. (*Id.* ¶ 23.) This case arises from Tidmarsh's longstanding personal vendetta against Tang, who is the Chair of the Board of Aurinia and whose company Tang Capital is Aurinia's largest shareholder. (Compl. ¶¶ 28, 66.) Tang became the object of Tidmarsh's ire because of the pair's interactions at multiple pharmaceutical companies. First, in May 2010, Tang Capital became a major shareholder of La Jolla Pharmaceutical Company (La Jolla). (*Id.* ¶ 30.) Shortly thereafter, Tidmarsh became President, CEO, and director of La Jolla, and Tang was appointed Chair of the Board of La Jolla. (*Id.*) Second, in October 2015, Tang Capital acquired a majority interest in American Laboratories, and Tang and Tidmarsh were both appointed as directors. (*Id.* ¶ 32.) As compensation for his role

3

with American Laboratories, Tidmarsh was granted a significant profits interest and, between 2018 and 2025, he was paid more than $22.5 million. (*Id.* ¶ 33.) As Tidmarsh knew from his role at American Laboratories, its top-selling product is the active pharmaceutical ingredient used to manufacture desiccated thyroid extract (DTE) products. (*Id.* ¶ 6.)

In November 2019, due to concerns over Tidmarsh's management of La Jolla, Tang asked Tidmarsh to resign from the various positions he held at La Jolla and American Laboratories. (Compl. ¶¶ 34-35.) Tang publicly "thank[ed]" Tidmarsh "for his contributions" and "wish[ed]" him "success in his future endeavors." (*Id.* ¶ 37.) To say that Tidmarsh's response was less magnanimous would be a gross understatement. In the ensuing years, Tidmarsh embarked on a revenge campaign against Tang and his associates, sending numerous unhinged messages cursing at and threatening Tang and his associates. (*Id.* ¶¶ 39-46.) Tidmarsh also badgered Tang about receiving payments from his profits interest in American Laboratories in the months leading up to his appointment as Director of CDER. He sent Tang two emails in November 2024, warning Tang of a "negative situation" unless he received what he wanted. (*Id.* ¶¶ 47-48.) Tidmarsh then demonstrated that his threat was far from idle when he announced on LinkedIn that he was "[w]orking with the new FDA to remove [DTE] permanently from the market." (*Id.* ¶ 49.) Leaving no doubt about his intentions, Tidmarsh emailed Tang a link to the LinkedIn post; the title of the email was simply "Good Luck." (*Id.* ¶ 50.)

On July 21, 2025, Tidmarsh was appointed Director of CDER, which is responsible for reviewing, approving, and regulating most prescription and over-the-counter drugs marketed in the U.S. (*Id.* ¶ 53.) Just over two weeks later, FDA announced that it was effectively removing DTE from the market, a decision that of course negatively impacted American Laboratories and Tang, not to mention the more than one million Americans who have relied on DTE products to

treat hypothyroidism for decades. (*Id.* ¶¶ 56-59.) Days later, Tidmarsh's personal lawyer emailed Tang proposing what was unmistakably a *quid pro quo*: that American Laboratories extend a component of Tidmarsh's profits interest—a services agreement—for 10 years in exchange for Tidmarsh assisting it with "issues"—issues Tidmarsh created by pushing for the removal of DTE. (*Id.* ¶¶ 61-62.) Tang refused to submit to this shocking abuse of power and explored the possibility of a criminal referral for extortion. (*Id.* ¶ 63.)

His vindictiveness not satiated by the damage already inflicted, on the morning of September 29, 2025, Tidmarsh posted the following on his personal LinkedIn account:



(Compl., Ex. 14.) The post clearly concerned Plaintiffs, the owner and sole U.S. marketer and distributor of voclosporin.

Tidmarsh did not publish his statements on his personal LinkedIn account because he believed they were true, but because he wanted to harm Tang by way of harming the Plaintiffs. The statements in this post are baseless and totally at odds with the available evidence and the conclusions of experts and regulators, including FDA. Voclosporin received full (not accelerated) approval from FDA based on FDA's determination that voclosporin had demonstrated direct

5

clinical benefit in treating patients with lupus nephritis. (Compl. ¶ 75.) FDA granted voclosporin full approval because—unlike drugs that receive accelerated approval based on an <u>unvalidated</u> surrogate endpoint (and therefore require confirmatory testing to show clinical benefit)—voclosporin demonstrated an improvement on a <u>validated</u> surrogate endpoint, which is an endpoint that, in FDA's own words, is "accepted by the FDA as evidence" of clinical benefit based on "extensive evidence" and "extensive testing" validating such direct clinical benefit.[2] For drugs granted full approval, sponsors are expressly not required to perform confirmatory testing to show clinical benefit, since clinical benefit has already been proven. (Compl. ¶ 75.) Indeed, in approving voclosporin, FDA stated: "Analysis of the efficacy data demonstrated that treatment with voclosporin ***induces a clinically meaningful benefit*** to subjects with lupus nephritis…."[3]

Industry observers noted that Tidmarsh's conduct was "highly unusual," as it was "unheard of" "for a top FDA official to use a personal social media account to criticize a specific drug, particularly without providing evidence to back up such a claim." (Compl., Ex. 15 at 3; Phillips Decl. Exs. B-D.) They also noted the mismatch between Tidmarsh's criticism of the accelerated approval process and the fact that voclosporin "boasts a full, standard FDA approval." (Dkt. 35-8 at 1; *see* Compl., Ex. 15 at 4.) And Tidmarsh's decision "to single out voclosporin, of all drugs," revealed that his fractious history with Tang was the core purpose behind the posts. (Compl., Ex. 15 at 4.)

Hours after this first post, Tidmarsh issued the following second LinkedIn post admitting that his first post represented his "personal views," not "the views of FDA or HHS," and that all

---

[2] FDA, Surrogate Endpoint Resources for Drug and Biologic Development (July 24, 2018), *available at* https://www.fda.gov/drugs/development-resources/surrogate-endpoint-resources-drug-and-biologic-development.

[3] FDA CDER, Multi-Discipline Review, App. No. 213716Orig1s000, at p.23, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/213716Orig1s000MultidisciplineR.pdf                    ("FDA Approval"). The Complaint incorporates this document by reference, so the Court may consider it.

official comments from FDA and HHS are made through "official channels:"



(Compl., Ex.16.) Tidmarsh soon thereafter deleted this second LinkedIn post. This tacit admission

of wrongdoing (Tidmarsh's petition omits any direct mention of this public admission) did not

mitigate the damage from his first LinkedIn post. His false statements caused Aurinia's share price

to plummet more than 20% in a matter of hours, wiping out more than $350 million in market

value. (*Id.* ¶ 83.)

Subsequently, Tidmarsh was placed on administrative leave by FDA due to "serious

concerns about his personal conduct," and he resigned as Director of CDER. (Phillips Decl. Ex. B

at 2; Ex. D at 3.)

## ARGUMENT

### I.  The Westfall Act Does Not Insulate Tidmarsh from Liability for His Tortious Conduct.

Tidmarsh first asks this Court to hold that when he defamed Plaintiffs on his personal

LinkedIn account, he was acting within the scope of his employment and therefore his conduct is

immune under the Westfall Act. (Mot. 9-19.) As an initial matter, Plaintiffs agree with the United

States that Tidmarsh's request is premature and should be denied because he cannot ask this Court

to make that decision until the U.S. Attorney for the District of Maryland has had an opportunity

to weigh in on the question. (Dkt. 37 at 4 (citing 28 U.S.C. § 2679(d)(3)).)[4]

---

[4] In his reply brief responding to the government, (*see* Dkt. 41), Tidmarsh asserts that he and the government apparently agree that his petition and motion should be "held in abeyance" while attacking Plaintiffs for not agreeing

If this Court nonetheless reaches the substance of the petition, it should deny it. Under the Westfall Act, Tidmarsh must show by a "preponderance of the evidence" that he was acting within the scope of his employment[5] and, as a result, that the U.S. should be substituted for him as the sole defendant in this case. (Mot. 8); *see* 28 U.S.C. § 2679(d)(3); *De Martinez v. Lamagno*, 515 U.S. 417, 426 (1995).[6] Here, uncontroverted evidence,[7] including Tidmarsh's own words and actions, demonstrates that when he attacked Plaintiffs, he was doing so in his personal capacity and purely to serve his own interests. Therefore, his tortious conduct is not protected by the Westfall Act and his request for certification and substitution should be rejected. At a minimum, given all the evidence demonstrating that Tidmarsh was acting to further his only personal interests when he published the first post, Plaintiffs should be permitted to conduct limited discovery on the issue if the Court is not inclined to deny Tidmarsh's request outright.

### A. Tidmarsh's defamatory statements were made in his personal capacity, not in the scope of his employment as Director of FDA's CDER.

To decide the issue, this Court need look no further than Tidmarsh's own words. His explicit admission that he was acting in his personal, not his official, capacity when he defamed Plaintiffs is decisive on the scope-of-employment issue. As set forth above, shortly after he posted his false statements on LinkedIn, Tidmarsh: (1) deleted that post; and (2) expressly admitted in his follow-up LinkedIn post that "[t]he views in my last post were my own personal views. They do

---

[5] If the U.S. Attorney for the District Court of Maryland certifies that Tidmarsh acted within the scope of his employment, then the burden of persuasion would shift to Plaintiffs to show by a preponderance of the evidence that Tidmarsh "was not acting within the scope of his employment." *Ross v. Bryan*, 309 F.3d 830, 833 (4th Cir. 2002). As demonstrated herein, the evidence shows that Tidmarsh plainly was not acting within the scope of his employment regardless of who bears the burden on this issue.

to his request for a second, 30-day extension of time to respond to the Complaint. (*Id.* at 2-4.) It is procedurally improper for Tidmarsh to seek relief from the Court via a reply brief, and he fails to mention that in light of the government's filing, Plaintiffs asked if he would be willing to withdraw his petition (without prejudice) so that the parties could focus their briefing on the motion to dismiss. Tidmarsh's counsel ignored the outreach.

[6] Maryland tort law governs this issue. (Mot. 10); *see Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir. 1994).

[7] This Court can consider evidence outside the Complaint to decide the scope-of-employment question. *See* Mot. 5 n.1; *Ross*, 309 F.3d at 834.

not reflect the views of FDA or HHS." (Compl. Ex. 16.) He further acknowledged that "[a]ll official guidance or comments from the Agency or Department are made through official channels," not through personal LinkedIn pages. (*Id.*) He then went even further, stating that for the "avoidance of confusion"—*i.e*, to negate even the perception that he published the post in an official capacity—he had deleted the first post. (*Id.*)

It is hardly surprising that Tidmarsh's petition omits ***any mention*** of this public admission, because it is devastating to Tidmarsh's made-for-litigation position that he was acting in the scope of his employment with FDA when he defamed Plaintiffs on his personal social media account. Tidmarsh's deliberate decision to not even address his second LinkedIn post, where he disavowed that he was acting on behalf of FDA, undercuts every argument he makes and renders every case he relies on distinguishable, because none involved an explicit admission by the official in question that he was acting in a personal, rather than professional, capacity.

Tidmarsh's public recognition that he was not acting within the scope of his employment when he defamed Plaintiffs also comports with well-settled Maryland tort law. *Sawyer v. Humphries*, 587 A.2d 467 (Md. 1991) supplies the framework for this Court to resolve the scope-of-employment issue (Mot. 11). In *Sawyer*, the Maryland Court of Appeals demarcated "cases involving intentional torts committed by an employee," holding that "***where an employee's actions are personal or where they represent a departure from the purpose of furthering the employer's business***, or ***where the employee is acting to protect his own interests***, even if during normal duty hours and at an authorized locality, ***the employee's actions are outside the scope of his employment***." 587 A.2d at 471. And where "the conduct of the servant is unprovoked, highly unusual, and quite outrageous," that, by itself, "is sufficient to indicate that the motive was a purely personal one" and that the relevant conduct occurred "outside the scope of employment." *Id.* Thus,

9

in *Sawyer*, the court held that a police officer who threw a rock at the plaintiff was not acting within the scope of his employment because even though a "police officer may be on 'duty' 24 hours a day," the officer's conduct was not "expectable." *Id.* at 472-73.

Here, the evidence shows that Tidmarsh published his first LinkedIn post only for personal reasons, not to further official FDA business. And it is hard to think of a more apt description of the fusillade Tidmarsh unleashed against Plaintiffs than "unprovoked, highly unusual, and quite outrageous." *Id.* at 471.

The Complaint—as well as subsequent developments like Tidmarsh's separation from FDA based on "serious concerns about his ***personal*** conduct," (Phillips Decl. Ex. B at 2, Ex. D at 3)—amply demonstrates that Tidmarsh's motive for publishing the LinkedIn post was purely personal and based on his animus toward Tang. Notably, Tidmarsh does not point to any contemporaneous developments prompting his gratuitous diatribe against Plaintiffs. Nor could he. The FDA fully approved voclosporin, "a rather obscure drug," in 2021, (Compl., Ex. 15 at 2-3), after determining that it was safe, effective, and would "provide another much-needed treatment option for adult patients with active lupus nephritis,"[8] then greenlit a supplemental new drug application in 2024, which resulted in the addition of long-term efficacy and safety data to support the use of voclosporin beyond one year. (*See* Phillips Decl. Ex. A). And while Tidmarsh claimed in his post to be concerned about FDA's accelerated approval of drugs based on testing using unvalidated surrogate endpoints, (Compl. ¶ 70), that professed concern has nothing to do with Plaintiffs or voclosporin, because "voclosporin received full," not accelerated, "approval based on a clinical trial using the most robust endpoint for lupus nephritis." (Compl., Ex. 15 at 4; Dkt. 35-8 at 1 ("The drug boasts a full, standard FDA approval, which is curious considering Tidmarsh

---

[8] Compl. ¶ 76 n.8 (citing FDA CDER, Multi-Discipline Review, App. No. 213716Orig1s000, at p. 256, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/213716Orig1s000MultidisciplineR.pdf).

seemed to be railing against the use of surrogate endpoints to inform accelerated greenlights."); *see also* Compl. ¶¶ 75-76 & n.8.)

Instead, as the Complaint demonstrates and as industry observers recognized contemporaneously, Tidmarsh had one, and only one, motivation for publishing the post: furthering his retaliatory campaign against Tang that began in 2019 when Tang removed Tidmarsh from positions at companies affiliated with Tang and Tang Capital, and manifested through years of vulgar messages, threats, and a blatant and unsuccessful attempt at extorting and soliciting a bribe from Tang. (*Id.* ¶¶ 38-82; Compl., Ex. 15 at 3 ("[W]hat got investors so worked up about Tidmarsh's comment was speculation about his motivation, particularly in light of his personal connection to Kevin Tang[.]")). Indeed, industry observers recognized that Tidmarsh's personal animus towards Tang was the driving force behind the first LinkedIn post, as "[t]he circumstances surrounding the end of Tidmarsh's time with La Jolla Pharma would have been forgotten to biotech history had he not chosen to single out voclosporin, of all drugs[.]" (*Id.* at 4.)

This case is thus substantially like *Ennis v. Crenca*, 587 A.2d 485 (Md. 1991). There, the Maryland Court of Appeals applied the test from *Sawyer* to conclude that an elected official's reporting of an alleged bribe to the press was "outside the scope of" his "employment" because the "false and defamatory statement" was made "for the official's own purposes." *Id.* at 489-91; *see Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 146 (4th Cir. 2018); *Jamison*, 14 F.3d at 237. The evidence shows that Tidmarsh's attack on Plaintiffs and their voclosporin product arose "wholly from some external, independent, and personal motive"—Tidmarsh's desire to exact revenge on Tang—and thus that he was not acting within the scope of his employment when he published the first LinkedIn post. *Garnett*, 892 F.3d at 146.

FDA's social media policy underscores that Tidmarsh was acting purely in his personal

capacity when he defamed Plaintiffs. That policy strictly precludes employees from speaking for the Agency on their personal social media accounts and makes clear that "when employees use social media tools in a personal capacity, they are not speaking for the Agency, and it should not appear to others as though they are speaking for FDA." (Phillips Decl. Ex. E at 5.) Indeed, that policy sets out special rules for "senior leaders" precisely because their words can carry so much influence:

> "[T]hese leaders should take greater care to clarify that their *personal* social media accounts are not official FDA accounts. Thus, the use of a disclaimer is recommended for senior FDA leaders' personal accounts to clarify that the account is personal. Further, in using ***personal*** social media accounts, senior FDA leaders ***should not appear to be making official statements on behalf of the agency*** ..."

(*Id*. at 6 (emphases in original).) This policy confirms that Tidmarsh could not have been acting in his official capacity when he targeted Plaintiffs on his personal social media account.

Tidmarsh's efforts to paint his conduct as motivated "by a purpose to serve CDER," (Mot. 14-16), are unpersuasive. He relies over and over on cases where courts explicitly found that there was no evidence to suggest that the motivation for the conduct at issue was a personal one, in stark contrast to the fact pattern here. Tidmarsh's reliance on *Maron v. U.S.*, 126 F.3d 317 (4th Cir. 1997), (*see* Mot. 15), is therefore misplaced. In that case, the Fourth Circuit affirmed the district court's findings that there was no "evidence" that the employees' conduct "was purely for personal motivation." *Id.* at 324; *see also Balt. City Police Dep't v. Potts*, 227 A.3d 186, 212 (Md. 2020) (Mot. 11, 18) ("[There is] no indication that the officers were serving their own interests in arresting Potts and James."). Similarly, in *Larsen v. Chinwuba*, 832 A.2d 193, 202 (Md. 2003), (*see* Mot. 13, 17), the Maryland Court of Appeals predicated its holding that statements made by the Maryland Insurance Commissioner were within the scope of his employment on the fact that lower courts held that the plaintiff's allegations "were insufficient" to show that the Commissioner acted purely for personal gain. *See Chinwuba v. Larsen*, 790 A.2d 83, 116 (Md. Ct. Spec. App.

2002) ("Chinwuba did not allege or point to any specific facts that would support his bald allegations of personal animus[.]"). The result in *Larsen* stemmed from this "very important factor" that provided the court a basis to distinguish both *Sawyer* and *Ennis*. 832 A.2d at 202. Likewise, in *Bobulinski v. Goldman*, 2025 WL 1707696, at *4 (D.D.C. June 18, 2025), (*see* Mot. 13), the "allegations in the complaint [did] not suggest that Congressman Goldman acted solely for his own purpose in commenting on Bobulinski's testimony." This case is far closer to *Sawyer* and *Ennis* than *Larsen* or *Bobulinski* because the Complaint is replete with allegations that Tidmarsh's misconduct was the direct byproduct of his personal animus towards Tang, (Compl. ¶¶ 38-82), and tangible evidence substantiates those allegations. (Compl., Ex. 15; Phillips Decl. Exs. B-E.)

In a similar vein, Tidmarsh argues that his LinkedIn post commented on "CDER's go-forward plans for evaluating the use of surrogate endpoints in drug testing" and that issuing such commentary was within the scope of his duties "as Director of CDER." (Mot. 14.) The force of that argument is nullified by Tidmarsh's decision to not just delete the first LinkedIn post, but to state *why* he was deleting the post: "All official guidance or comments from the Agency or Department are made through official channels." (Compl., Ex. 16.) And it is further neutered by the fact that his purported concern about accelerated drug approvals had nothing to do with voclosporin, which received full, not accelerated, FDA approval. (Compl. ¶ 75.) As industry observers recognized, the non-sequitur nature of the post, coupled with the evidence of Tidmarsh's longstanding animus toward Tang, shows that the discussion of accelerated approvals was a manufactured pretext for Tidmarsh to seek payback against an old nemesis. (Compl., Ex. 15.)

In addition to the well-documented evidence of his personal motivations for publishing the post, the "highly unusual" nature of Tidmarsh's conduct militates in favor of finding that Tidmarsh

acted outside the scope of his employment. *Sawyer,* 587 A.2d at 471. Tidmarsh's use of "a personal social media account to criticize a specific drug, particularly without providing evidence to back up such a claim" was, as industry observers noted, "highly unusual, if not unheard of." (Compl., Ex. 15 at 3; Dkt. 35-8 at 1; Phillips Decl. Ex. B at 2 (noting that Tidmarsh's first LinkedIn post was "a highly unusual move for a government official in his position"); Ex. C at 4 ("It's very unusual for an FDA regulator to single out individual companies and products … online.").)

The U.S. Department of Health and Human Services (HHS)—which directly oversees FDA—recognized that Tidmarsh's conduct in gratuitously targeting Plaintiffs was outrageous; before he resigned, HHS told him that "he had been placed on leave because of an investigation into a LinkedIn post he wrote[.]" (Phillips Decl. Ex. B at 2; Ex. D at 3 ("Tidmarsh has not directly addressed the claims but acknowledged that his LinkedIn comments … ultimately led to his administrative leave.").) The reason he then resigned shortly after being placed on leave is thus not hard to divine: Tidmarsh's brazen misuse of his position to pursue a longstanding grudge against Tang raised, as FDA put it, "serious concerns about his personal conduct." (*Id.*)

Tidmarsh's claim that his conduct was "incident to the performance of his duties" because it was "expected" and "foreseeable" is entirely at odds with the observations of contemporaries in the industry, who noted that it was anything but. (Mot. 12, 14). To the contrary, Tidmarsh's "highly unusual" LinkedIn post blindsided knowledgeable observers precisely because it was "unheard of" for someone in Tidmarsh's position to make specious, evidence-free claims about one particular drug. (Compl., Ex. 15 at 3; Dkt. 35-8 at 1; Phillips Decl. Ex. B at 2; Ex. C at 4.) Unsurprisingly, Tidmarsh does not identify any examples of other high-level FDA officials using their personal social media accounts to single out by name a specific drug that has not been the object of official

FDA action.[9]

Tidmarsh contends that the fact that the statements here were posted on a personal social media account is "irrelevant." (Mot. 17.) He is mistaken. Tidmarsh's position that he believed he was acting to further FDA business when he targeted Plaintiffs and their voclosporin product using his personal LinkedIn account—notwithstanding his pre-litigation admission to the contrary—is entirely belied by FDA's social media policy, which confirms that FDA officials like Tidmarsh are prohibited from using personal social media to further FDA official business. To the extent he seems to be claiming that he did so in violation of FDA policy, even the cases on which Tidmarsh relies confirm that conduct that is unauthorized is more likely to be found to be outside the scope of employment. For example, while *Tall v. Bd. of Sch. Comm'rs of Balt. City*, 706 A.2d 659, 667 (Md. Ct. Spec. App. 1998) observes that an employee's "forbidden" conduct can still be within the scope of his or her employment, (*see* Mot. 17), Tidmarsh neglects to mention that the court in *Tall* went on to hold that the employee's conduct "was ***not*** within the scope of his employment" because "it constituted a drastic departure from the Board's policy." *Tall*, 706 A.2d at 671 ("Manning's conduct was neither expected, foreseeable, nor sanctioned."); *see also Brown v. Brockett*, 2012 WL 1552783, at *5 (D. Md. Apr. 27, 2012) (cited at Mot. 18) ("[A] reasonable jury could conclude that Brockett hastily sent an accusatory email [in violation of University policy] … for reasons other than furthering her employer's business."). And though the court in *Smith v. Clinton*, 253 F. Supp. 3d 222 (D.D.C. 2017) concluded that then-Secretary Clinton acted within the scope of her employment when she used a private email server, (*see* Mot. 17), it reached that conclusion because she used the server to communicate "with other State Department personnel

---

[9] *Alessa v. Phelan* (cited at Mot. 2, 18) is not on point, as there, the court found that a Navy officer's remarks about an ex-employee "were foreseeable" because the officer "was discussing Navy business during either Navy-sponsored or Navy-attended meetings with other Navy … colleagues." 2025 WL 1019808, at *9 (D. Md. Apr. 3, 2025).

and advisors about the official business of the department." *Clinton*, 253 F. Supp. 3d at 237. That is a far cry from what happened here, with Tidmarsh acknowledging that his conduct was not in furtherance of "official" FDA business. (Compl. Ex. 16.) *Does 1-10 v. Haaland* (cited at Mot. 13, 18-19), also involved tweets sent from "official Congressional Twitter account[s]" that "fit within the wide range of legitimate errands performed for constituents" and were found not to be "gratuitous." 973 F.3d 591, 594, 602 (6th Cir. 2020).

Finally, Tidmarsh makes much of the fact that his title was listed on his LinkedIn account when he published the offending post. (*See* Mot. 17.) Under that logic, if Tidmarsh had posted on LinkedIn "I am picking up my dry cleaning" and his title—"Director of CDER"—was listed, then, according to him, that post would have been within the scope of his employment. Tidmarsh goes so far as to assert, without any support, that if he had posted about airline manufacturing defects, whether that post would be within the scope of his employment "would still be a close call." (*Id.* at 19.) It would not, and no case supports Tidmarsh's limitless position. Indeed, *Sawyer* rejected a substantially similar argument, observing that even though a police officer may be "on duty all of the time" that does not mean that all of the officer's actions are "in furtherance of his employer's law enforcement function." 587 A.2d at 472-73.[10]

In sum, the scope-of-employment issue is not a close call. Tidmarsh made the Court's job easy when he admitted, prior to litigation, that he published the offending LinkedIn post solely in his personal capacity. And the evidence shows that Tidmarsh's highly unusual, unheard-of conduct was not motivated by a desire to further the official business of FDA but was instead solely motivated by a personal desire to seek retribution against Tang, the Chair of the Board of Aurinia.

---

[10] Underscoring the point, even as of this writing, months after Tidmarsh resigned as Director of CDER—his personal LinkedIn still identifies him as such. (Phillips Decl. Ex. F.)

**B. At a minimum, this Court should allow Plaintiffs to take limited discovery on the scope-of-employment issue.**

Because Tidmarsh plainly was acting purely in a personal capacity when he published the first LinkedIn post, his conduct is not protected by the Westfall Act. If, however, this Court concludes that there are "'genuine question[s] of fact material to the scope-of-employment issue,'" it should "allow" Plaintiffs "some limited discovery" on this point given the evidentiary showing Plaintiffs have already made and the glaring chasm between Tidmarsh's pre-litigation admission that he was not acting within the scope of his employment and his current position that he was. *Neuberger v. U.S.*, 2005 WL 1242058, at *3 (D. Md. May 25, 2005) (quoting *Gutierrez de Martinez v. Drug Enforcement Admin.*, 111 F.3d 1148, 1155 (4th Cir. 1997)); *see Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003). As noted, on the eve of the filing of this lawsuit, Tidmarsh was put on leave by FDA due to "serious concerns about his personal conduct" detailed in the Complaint. (Phillips Decl. Ex. B at 2, Ex. D at 3.) That FDA itself had concerns about Tidmarsh's actions—and considered them to be "***personal***" conduct—is plainly relevant to the question of whether Tidmarsh was acting within the scope of his employment when he targeted Plaintiffs. If the Court thinks the voluminous evidence adduced so far is not sufficient to show that Tidmarsh's motivations for publishing the post were solely personal, Plaintiffs should be permitted discovery to explore the circumstances of Tidmarsh's separation from FDA and other evidence bearing on his conduct and motivations.

**II. The Court Should Deny Tidmarsh's Motion to Dismiss.**

In addition to seeking Westfall Act certification, Tidmarsh also argues that Plaintiffs fail to state claims for defamation and injurious falsehood. Each of Tidmarsh's arguments should be rejected. He asserts that Plaintiffs do not plausibly allege that the statements in his LinkedIn post were false, but he ignores the full context and import of his ***multiple*** false statements. He asserts

17

that Plaintiffs are "limited-purpose" public figures subject to the actual malice standard, but he identifies no preexisting public controversy involving Plaintiffs, and in any event, the Complaint amply pleads actual malice. Finally, with respect to the injurious falsehood claim, he claims that Plaintiffs fail to plead special damages, but he is mistaken in asserting that the enormous drop in Aurinia's stock price caused by his false statements is not cognizable special damages.

### A. Tidmarsh's statements about voclosporin were objectively false.

Plaintiffs have clearly pled that Tidmarsh's defamatory statements about them and voclosporin were false. Despite acknowledging that the falsity analysis must consider the statements at issue in their entirety, (Mot. 21), Tidmarsh ignores the broader context and overarching falsity of his statements and myopically focuses on a hyper-technical argument based on his use of the word "direct" in his post. (*Id.* at 22-24.) In context, however, a reasonable reader could have understood Tidmarsh's statements to convey a false message about voclosporin's approval and efficacy—which is the relevant inquiry for the Court at this stage. *See Tomblin v. WCHS-TV8*, 434 F. App'x 205, 210 (4th Cir. 2011) (overruling summary judgment in favor of defendant where "taken as a whole, there could be a question of fact" as to whether the statements at issue produced a false "implication, innuendo, or insinuation'" about the plaintiff).

Tidmarsh's first LinkedIn post in fact layered multiple false statements on top of one another. Although he completely ignores it, the broader context of his post, as summed up in its concluding sentence, purported to be about FDA's "accelerate[d]" approval process for drugs, where FDA will grant earlier approval for certain drugs based on testing using an "unvalidated surrogate endpoint," subject to later confirmatory testing to show that the drug provides a clinical benefit to patients. (Compl. ¶¶ 70, 75.) He warns that this process results in FDA accelerating the approval of certain drugs without "requiring companies to perform the trials necessary to confirm actual clinical benefit." (*Id.* ¶ 70.) And he singles out voclosporin as a supposed example of a drug

that received a short-cut, accelerated approval without conducting the necessary "confirmatory" testing to demonstrate an "actual clinical benefit" to patients. (*Id*.) Taken together, Tidmarsh's statements thus could have conveyed to reasonable readers that voclosporin got an accelerated FDA approval, that Plaintiffs failed to perform the necessary confirmatory testing on voclosporin, and that voclosporin has not been shown to have an "actual clinical benefit" to patients.

Those assertions are false. Voclosporin in fact "received full (not accelerated) approval from FDA," based on extensive evidence and testing validating direct clinical benefit. (*Id*. ¶ 75.) Because voclosporin received full approval, Plaintiffs were "expressly not required to perform confirmatory testing to show clinical benefit, since it is understood that clinical benefit has already been proven." (*Id*.) Indeed, in granting ***full approval*** for voclosporin, FDA concluded that "[a]nalysis of the efficacy data demonstrated that ***treatment with voclosporin induces a clinically meaningful benefit to subjects with lupus nephritis***[.]" (*Id*. ¶ 76.). FDA also concluded there was "substantial evidence meeting the evidentiary standard for the ***clinical effectiveness*** of voclosporin[.]"[11]

Ignoring entirely his false statements about the nature of voclosporin's approval, his false claim that Plaintiffs failed to perform necessary confirmatory testing, and his false claim that there is ***no evidence*** of voclosporin providing an "actual clinical benefit" to patients, Tidmarsh focuses his defense on his use of the single word "direct," and claims that what he was really getting at is a highly-technical debate about approvals based on surrogate endpoints versus "direct clinical endpoints." (Mot. 23-24.) But the post itself belies Tidmarsh's claim. The post did not say that voclosporin's benefits had not been shown on "direct clinical endpoints"; it said, in successive sentences, that voclosporin had not been shown to have "direct" or "actual clinical benefit."

---

[11] FDA Approval at p. 26.

That claim—that there is *no evidence* of direct or actual clinical benefit from Plaintiffs' voclosporin product—is emphatically and demonstrably false. Voclosporin received full FDA approval based on testing using *validated* surrogate endpoints, which are, according to FDA itself, "accepted by the FDA *as evidence of benefit*," and are used "in cases where the *clinical benefit* of improving the surrogate endpoint, such as controlling blood pressure, is well understood." (Compl. ¶ 75 n.7.) In the case of voclosporin, it was proven to help stabilize kidney function in adults with active lupus nephritis where deterioration of function over time can lead to renal failure and even death, (*Id.* ¶ 77), which is precisely why FDA concluded that voclosporin produced "*a clinically meaningful benefit* in subjects with active lupus nephritis…." (*Id.* ¶ 76 n.8 (citing FDA Approval at p. 168).)

Tidmarsh asks the Court to conclusively determine, at this nascent stage, that readers would have understood his post as referencing a highly-technical debate about full approvals based on testing using validated surrogate endpoints versus "direct clinical endpoints." But that inherently factual claim—which Plaintiffs vigorously dispute—is no basis for dismissal, and in any event this Court's task is not to ask how some expert steeped in the intricacies of drug approvals possibly could have understood the post, but rather to ask how an ordinary person could have understood it. *Sotolongo v. Baltimore Bus. Publ'cns, Inc.*, 1988 WL 137768, at *1 (D. Md. Oct. 25, 1988) (citing *Phillips v. Washington Mag., Inc.*, 58 Md. App. 30, 36 (1984)); *see also Cannon v. Peck*, 36 F.4th 547, 561 (4th Cir. 2022). Indeed, the question for the Court at this early stage is simply whether a reasonable factfinder *could* interpret the post as conveying a false message about voclosporin. *Daniel v. Home Box Office*, 2023 WL 8478867, *15 (D. Md. Dec. 7, 2023); *Batson v. Shiflett*, 602 A.2d 1191, 1210-11 (Md. Ct. App. 1992) ("If words are capable of more than one meaning or a defamatory meaning could be inferred, then the meaning to be attributed to them is

a question of fact for the jury.").

Here, there is no doubt that a reasonable reader (and indeed any credible expert) could have interpreted Tidmarsh's post as asserting multiple falsehoods, including that Plaintiffs' voclosporin product provides no direct or "actual" clinical benefit to patients, because that is exactly what Tidmarsh said. To understand how a reasonable reader could have interpreted a phrase like "actual clinical benefit," courts look to popular dictionary definitions. *Cannon*, 36 F.4th at 561. The dictionary definition of "actual" is "existing in fact or reality." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020). So, when Tidmarsh stated there was nothing to show "direct" or "actual clinical benefit" from voclosporin, he falsely conveyed to reasonable readers that there was no evidence that voclosporin benefits patients. That statement simply cannot be squared with FDA's conclusion that voclosporin ***does*** provide "a ***clinically meaningful benefit*** to subjects with lupus nephritis…." (Compl. ¶ 76.)

This interpretation of Tidmarsh's post is not speculative. The post caused "confusion and alarm among patients and their physicians" and an enormous, immediate drop in Aurinia's stock price, precisely because readers understood the post as asserting that voclosporin received a short-cut, accelerated approval and that Aurinia failed to conduct the testing needed to confirm that voclosporin actually benefits patients. (*See, e.g.*, Compl. ¶¶ 84-85, 109, 113.) And real-world readers' understandings of a statement are powerful evidence of how reasonable readers could understand it. *See* 1 R. Smolla, Law of Defamation § 4:2.50 (2d ed.) (citing *Tah v. Global Publ'g, Inc.*, 413 F. Supp. 3d 1, 11-12 (D.D.C. 2019), and *Gaprindashvili v. Netflix, Inc.*, 2022 WL 363537, at *7 (C.D. Cal. Jan. 27, 2022)). Even if those readers' interpretation is just one reasonable interpretation of the post, moreover, Tidmarsh's Motion would still fail because, at this stage, in determining "whether the words and statements complained of" "are reasonably susceptible of the

meaning ascribed to them," "every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 331 (4th Cir. 2005).

In sum, as much as Tidmarsh would like to make it one, this is not a scientific dispute about the method Plaintiffs used to show that voclosporin provides a benefit to patients. (*E.g.*, Mot. 22 (positing, wrongly, that the "crux" of Plaintiffs' argument concerns the method by which it was demonstrated that voclosporin has a clinical benefit).) If his first LinkedIn post truly concerned a bona fide scientific debate about the merits of accelerated drug approvals, Tidmarsh would not have singled out voclosporin (which did not receive accelerated approval) but would have focused on drugs that actually received accelerated approval. Instead, in a transparent effort to cause harm to Plaintiffs, Tidmarsh falsely told the world that Plaintiffs' voclosporin product received an accelerated approval without a showing that it benefits patients, that Plaintiffs then failed to perform necessary testing to validate that benefit, and that there is no evidence that voclosporin provides clinical benefit to patients. A reasonable reader could interpret those claims as being false and defamatory because, as the Complaint amply alleges, they are. *See Goldstein v. Hindle*, 2024 WL 473736 at *3 (D. Md. Feb. 7, 2024) ("Regarding the second element, a statement is 'false' if it is 'not substantially correct.' A plaintiff must simply allege that the statements were false. Plaintiffs have done so in their Complaint, and thus they have satisfied this element."). Because the Complaint amply pleads falsity and the post is plainly capable of being interpreted as defamatory, the ultimate question of whether it defamed Plaintiffs is for the jury.

### B. Tidmarsh does not establish that Plaintiffs are public figures because he identifies no "public controversy" involving Plaintiffs or voclosporin.

Tidmarsh argues that Plaintiffs are "limited-purpose public figures," and that they therefore must establish that Tidmarsh published the LinkedIn post with "actual malice," *i.e.*, "with reckless disregard for its truth or with actual knowledge of its falsity." (Mot. 25.) As set forth below,

Plaintiffs' allegations of actual malice are more than sufficient at this stage. However, the Court does not even need to determine whether they are, because Tidmarsh has failed to meet his "burden of proving that" Plaintiffs are "public figure[s]" subject to the actual malice standard. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994).

Even assuming for the sake of argument that Tidmarsh's post addressed a matter of "public concern" in a broad sense, Tidmarsh fails to demonstrate the essential second element of the public-figure test: that Plaintiffs injected themselves into a specific, ***preexisting public controversy*** concerning the efficacy of voclosporin. (*See* Mot. 25 (acknowledging that a defendant must establish that the speech involved a matter of public concern, and then demonstrate that a plaintiff voluntarily injected itself into, and sought to influence, a public controversy that existed prior to the publication of the defamatory statement).) Here, Tidmarsh relies entirely on the fact that Plaintiffs submitted applications for FDA approval of voclosporin and claims this suffices as a "public controversy" because there is a generalized public interest in the adequacy of the testing and approval process for drugs. (Mot. 26-27.)

But the Supreme Court has rejected the use of this type of "subject-matter classification" to define a public controversy. *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979). Indeed, *Hutchinson* is directly on point. In that case, the defendant claimed that the plaintiff was a public figure because he received federal funds for a research project and there was a generalized public controversy about the expenditure of public funds by the government. *Id*. The Supreme Court rejected this "subject-matter classification[]" of a public controversy, noting that if this approach were accepted, "everyone who received or benefited from the myriad public grants for research would be classified as a public figure—a conclusion that our previous opinions have rejected." *Id*. Instead, the defendant was required to identify a "***particular public controversy***" involving the

23

plaintiff. *Id.*; *see also Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1297 (D.C. Cir. 1980) (holding that a "general" concern "shared by most [people] … is not sufficient," and to qualify as a public controversy, the "***specific question***" or issue giving rise to the defamation must be "being debated publicly" and "receiv[ing] public attention").

Here, Tidmarsh points to nothing to suggest that there was an ongoing controversy concerning the efficacy of voclosporin, a treatment approved by FDA five years prior, before he created one with his LinkedIn post.[12] He does not attempt to argue that the question was being publicly debated anywhere, let alone that such a debate was being covered by the press. *See Wells v. Liddy*, 186 F.3d 505, 540 (4th Cir. 1999) ("To prove that the plaintiff is a central figure in the controversy, the defendant must put forth evidence that the plaintiff has been the regular focus of media reports on the controversy.").[13] And indeed, the Fourth Circuit authority that Tidmarsh relies upon conclusively rejects the notion that Plaintiffs became public figures simply by seeking FDA approval for voclosporin years before his LinkedIn post. In *Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681 (4th Cir. 1989), (*see* Mot. 25, 26, 27), the defendant argued that the plaintiff bank was a public figure in relation to statements the defendant published questioning the bank's finances because of a generalized public concern regarding the solvency of financial institutions. *Id.* at 688. The Court emphatically rejected this approach, refusing to "accept the proposition" that "a business enterprise loses much of the protection afforded by the traditional law of defamation simply as a result of being subject to pervasive governmental regulation," because if that were the case, "the existence of ongoing public interest in the stability of society's financial institutions and

---

[12] The fact that the LinkedIn post garnered significant attention and debate is irrelevant, as "[t]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson*, 443 U.S. at 135.

[13] The reporting on Tidmarsh's LinkedIn post belies the notion of any preexisting controversy concerning Plaintiffs' voclosporin product, with one industry publication referring to it as "a rather obscure drug." (Compl. Ex. 15 at 3.)

markets" would "automatically elevate[] every member of the regulated class to public figure status." *Id*. This would "effectively collapse" the "dual inquiry" of examining whether the speech in question relates to a matter of public concern *and* whether the plaintiff is a public figure involved in a public controversy. *Id*. Instead, "a plaintiff should not be considered a limited-purpose public figure absent the existence of a pre-defamation public controversy in which the plaintiff has become directly involved," and "there simply was no specific pre-existing public controversy directly or proximately concerning Blue Ridge Bank's solvency." *Id*.

Here, Tidmarsh attempts to do exactly what *Hutchinson* and *Blue Ridge Bank* forbid, by assuming that a general issue of public concern—the public's interest in the testing and approval process for drugs—necessarily equates to a *particular public controversy* involving Plaintiffs and voclosporin. Having failed completely to demonstrate "the existence of a pre-defamation public controversy in which the plaintiff[s] ha[d] become directly involved," and there in fact being "no specific pre-existing public controversy directly or proximately concerning [voclosporin's efficacy]" prior to the publication of his LinkedIn post, *see id*. at 688, Tidmarsh has not established that Plaintiffs are public figures subject to the actual malice standard, rather than the negligence fault standard applicable to private figure plaintiffs.[14]

### C. Plaintiffs more than sufficiently allege that Tidmarsh acted with actual malice.

Tidmarsh next argues that because Plaintiffs are limited purpose public figures, they are required to allege that he published the LinkedIn post with actual malice, and he asserts that Plaintiffs failed to do so. (Mot. 28-29.) But Tidmarsh's Motion misstates Plaintiffs' burden, improperly attempts to factually dispute the direct evidence of actual malice Plaintiffs pleaded,

---

[14] *See Blue Ridge Bank*, 866 F.2d at 689 (a private figure defamation plaintiff need only prove by a preponderance of the evidence that the defendant published a statement with negligence). Tidmarsh does not argue that Plaintiffs failed to sufficiently allege negligence.

and completely ignores the mountain of circumstantial evidence set forth in the Complaint.

Although Tidmarsh is correct that the actual malice standard imposes a heightened burden on public-figure plaintiffs to ultimately prove up actual malice at trial, Mot. 24-25, at this stage of the case, Plaintiffs' burden for pleading actual malice is no more demanding than it is for any other element of their claims. As the Supreme Court and courts in this Circuit have noted, Federal Rule of Civil Procedure 9(b) expressly permits malice and "other conditions of a person's mind [to] be alleged generally," in the same way as any other allegation under Rule 8. *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009); *see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("Rule 9(b) ensures there is no heightened pleading standard for malice, but malice must still be alleged in accordance with Rule 8—a 'plausible' claim for relief must be articulated."); *Jones v. Aberdeen Proving Ground Fed. Credit Union*, 2022 WL 1017094, at *20 (D. Md. Apr. 5, 2022) (similar). The actual malice inquiry also involves subjective evaluation of the defendant's state of mind—the type of factual assessment that should be left to the jury. *Denny v. Seaboard Lacquer, Inc.*, 487 F.2d 485, 491 (4th Cir. 1973); *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 874-75 (W.D.Va. 2016) (collecting cases).

Here, Plaintiffs directly alleged, repeatedly, that Tidmarsh published the LinkedIn post with knowledge of falsity or a high degree of awareness of probable falsity. (*See* Compl. ¶¶ 16, 70, 81-82, 114, 125; Mot. 28 (acknowledging the standard for actual malice).) Far from being limited to conclusory allegations, the Complaint specifically alleges that Tidmarsh "was personally aware that voclosporin received full approval based on a validated surrogate endpoint, well understood the difference between validated and unvalidated surrogate endpoints, and knew of the voluminous evidence refuting his false statements, including, but not limited to, evidence described and relied upon by the agency for which Tidmarsh works," and that while he thus knew

that his claims that voclosporin received accelerated approval, that Plaintiffs failed to perform required confirmatory testing, and that there is no evidence of voclosporin providing a clinical benefit were false, he published them anyway in order to harm Tang. (Compl. ¶¶ 81-82.) Tidmarsh's only response to these allegations is to attempt to dispute whether he could have had such knowledge as a factual matter, (Mot. 28 (disputing that Tidmarsh was knowledgeable about voclosporin because of the "sheer volume" of drugs he had oversight of), which he may not do at this stage. *See Hebb v. City of Asheville*, 145 F.4th 421, 432 (4th Cir. 2025).

In addition to failing to grapple with Plaintiffs' direct allegations of actual malice, Tidmarsh ignores entirely the fact that a plaintiff is also entitled to prove actual malice by circumstantial evidence. The Supreme Court has long recognized that defamation defendants "are prone to assert their good-faith belief in the truth of their publications," so that "plaintiffs will rarely be successful in proving awareness of falsehood from the mouth of the defendant himself." *Herbert v. Lando*, 441 U.S. 153, 170 (1979). Accordingly, "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). Cognizable circumstantial evidence of actual malice includes, among other things, evidence that a defendant harbored ill will towards the plaintiff and sought to cause injury. *Eramo*, 209 F. Supp. 2d at 872; *Connaughton*, 491 U.S. at 688. Here, Plaintiffs have alleged in detail, and attached documentary evidence showing, how the defamatory statements at issue were part and parcel of a longstanding vendetta against Tang, who Tidmarsh had threatened, harassed, and attempted to extort before Tidmarsh targeted Plaintiffs in his LinkedIn post. (Compl. ¶¶ 38-82.) This well-pleaded pattern of behavior is powerful evidence of actual malice, but Tidmarsh's Motion simply ignores it. *See Herbert*, 441 U.S. at 164, n.12 (noting that, in alleging actual malice, "all the relevant circumstances of the transaction may be shown,"

27

"including threats, prior or subsequent defamations, subsequent statements by the defendant, [and] circumstances indicating the existence of rivalry, ill will, or hostility between the parties"); *see also Hindle*, 2024 WL 473736, at *4 ("Because Plaintiffs claim [Defendant] knew the statements were false, taken with the allegations that he was acting in a retaliatory manner, Plaintiffs have shown actual malice.").

Finally, Tidmarsh also argues that at most, the Complaint only plausibly alleges that he failed to investigate the accuracy of his statements before he published them, and that this "cannot establish reckless disregard for the truth." (Mot. 28.) As set forth above, Tidmarsh is wrong about what the Complaint alleges, but he is also wrong that a total failure to investigate before publishing obviously harmful statements is not suggestive of actual malice. In fact, while failure to investigate is not ***independently*** sufficient to establish malice, it is cognizable circumstantial evidence that, together with other evidence like bias and departure from professional standards, can support a finding of actual malice. *Connaughton*, 491 U.S. at 692; *Eramo*, 209 F. Supp. 2d at 872. Here, the Complaint alleges facts demonstrating that the LinkedIn post departed from FDA standards and policies ***and*** that Tidmarsh acted with ill will and intent to injure. (Compl. ¶¶ 89-94.)

### D.  Tidmarsh's special damages argument does not warrant dismissal of the injurious falsehood claim.

Finally, Tidmarsh urges this Court to dismiss Plaintiffs' injurious falsehood claim for failing to plead special damages. (Mot. 29-30.) The Court should reject that contention, too.

To state a claim for injurious falsehood, a plaintiff must plead that the defendant's statements caused it "special damages," *i.e.*, the loss of something having economic or pecuniary value. *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 527 (D. Md. 2023); *see Austin v. Torrington*, 810 F.2d 416, 423 (4th Cir. 1987). Goodwill "constitutes a valuable asset of the business of which it is a part"; it has recognized pecuniary value as a component of the

business's overall worth.[15] *BAA, PLC v. Acacia Mut. Life Ins. Co.*, 400 Md. 136, 166 & 164 n.24 (2007); *Strabak v. Strabak*, 108 Md. App. 633, 641 (1996). That makes loss of goodwill a type of special damage, as courts across the country have held. *E.g.*, *Kische USA, LLC v. Simsek*, 2016 WL 6273261, at *7 (W.D. Wash. June 29, 2016); *Scholes v. Am. Kennel Club, Inc.*, 1999 WL 799532, at *10 (S.D.N.Y. Oct. 7, 1999).

A drop in stock price is often evidence of lost goodwill because goodwill "generally constitute[s] an essential component of the value of each share of corporate stock." *Recovery Grp., Inc. v. C.I.R.*, 652 F.3d 122, 129 (1st Cir. 2011) (citing *Home Sav. Bank v. City of Des Moines*, 205 U.S. 503, 512 (1907)). That is why "courts have accepted a decline in the stock price of a publicly traded defamed corporation as evidence of special damages." De Villiers, 15 Fordham J. Corp. & Fin. L. at 568.[16] So by pleading that Tidmarsh's statements caused a decline in Aurinia's share price—amounting to a loss of more than $350 million (Compl. ¶ 83)—the Complaint adequately describes evidence of lost goodwill and, therefore, of special damages.

Tidmarsh's counterarguments do not withstand scrutiny. He first contends that only "the loss of particular customers by name or a general diminution of business" (Mot. 29) can constitute special damages. Maryland caselaw refutes that artificially cramped definition. *E.g.*, *Cheek v. J. B. G. Props., Inc.*, 28 Md. App. 29, 33 (Md. Ct. Spec. App. 1975) (special damages are those "whereby the claimant has been put to expense or inconvenience as a consequence of the

---

[15] In fact, the Financial Accounting Standards Board "has a voluminous standard for dealing with goodwill in order to calculate its value on a balance sheet." *Torres Advanced Enterprise Sols. LLC v. Mid-Atlantic Professionals Inc.*, 2013 WL 531215, at *5 (D. Md. Feb. 8, 2013). "A well-designed event study can [also] isolate the effect of a defamatory publication from the effects of other factors, in order to provide an estimate of the portion of the defamed company's share price change solely due to the defamation." Meiring De Villiers, *Quantitative Proof of Reputational Harm*, 15 Fordham J. Corp. & Fin. L. 567, 613 (2010).

[16] *E.g.*, *Sterling Sav. Ass'n v. Ryan*, 751 F. Supp. 871, 877 (E.D. Wash. 1990) ("Strong evidence of [loss of business] is the fact that the value of Sterlin's common stock has dropped in recent months from $9.00 per share to $4.00 per share."); *MiMedx Grp., Inc. v. DBW Partners LLC*, 2018 WL 4681005, at *5 n.5 (D.D.C. Sept. 28, 2018) (plaintiff may claim special damages "in the form of diminution of the company's stock price as opposed to solely lost profits").

defamatory language; or the loss of some benefit by reason of the wrongful utterance"). Tidmarsh next asserts that the drop in share price does not constitute special damages "because the stock rebounded." (Mot. 30.) But the fact that other, subsequent developments may have mitigated the harm from Tidmarsh's statements does not somehow render the statements harmless as a matter of law. Tidmarsh also points to a pair of district court decisions from Utah and New York holding that a drop in share price is not evidence of special damages. (Mot. 30 (citing *SCO Grp., Inc. v. Novell, Inc.*, 2010 WL 413807, at *6 (D. Utah Jan. 28, 2010), and *NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604, at *11 (E.D.N.Y. Mar. 28, 2022)).) Those cases are distinguishable because neither court considered reduced share price as evidence of lost goodwill—that is, neither court considered reduced share price in the way Plaintiffs rely on it here.

Aside from being wrong, Tidmarsh's argument is academic. If the Court decides that pleading diminished stock price is insufficient to show special damages, Plaintiffs can amend their Complaint to plead other forms of special damage that surfaced during and after filing the Complaint. For example, special damages include "the expense of measures reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon vendibility or value by disparagement," *Rite Aid Corp. v. Lake Shore Invs.*, 298 Md. 611, 624-25 (1984), and Plaintiffs have expended hundreds of thousands of dollars on public-relations and legal professionals to try to mitigate the harm from Tidmarsh's statements. The upshot is that, even if Tidmarsh's arguments about stock price were correct (they are not), the proper course would be to let Plaintiffs amend the Complaint.

## **CONCLUSION**

The Court should deny Tidmarsh's Petition and Motion to Dismiss.


Dated: January 13, 2026                   */s/ Andrew C. Phillips*
                                          Andrew C. Phillips (*Pro Hac Vice*)

Megan Meier (*Pro Hac Vice*)
Mark Thomson (*Pro Hac Vice*)
Archith Ramkumar (*Pro Hac Vice* pending)
MEIER WATKINS PHILLIPS PUSCH LLP
1120 20th St, NW, Suite 550
Washington, DC 20036
Email: andy.phillips@mwpp.com
Email: megan.meier@mwpp.com
Email: mark.thomson@mwpp.com
Email: archith.ramkumar@mwpp.com

Joseph L. Meadows (Bar No. 15856)
GORDON REES SCULLY MANSUKHANI, LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
Email: jmeadows@grsm.com

*Counsel for Plaintiffs Aurinia Pharmaceuticals Inc.*
*and Aurinia Pharma U.S., Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on January 13, 2026 a copy of the foregoing was served on all counsel of record via the Court's ECF system.

*/s/ Andrew C. Phillips*
Andrew C. Phillips
